(Nos. 15046-15047.—Judgments reversed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. JAMES J. SPAIN, Plaintiff in Error.—Same Defendant in Error vs. CHARLES E. DRISCOLL, Plaintiff in Error.

*Opinion filed February 21, 1923—Rehearing denied April 6, 1923.*

1. CRIMINAL LAW—*constitutional provision against giving incriminating evidence should be liberally construed.* The constitutional provision that "no person shall be compelled in any criminal case to give evidence against himself" should be applied in a broad and liberal spirit in order to secure to the citizen immunity from every species of compulsory self-accusation, and this immunity is not to be impaired by narrow construction of the language used.

2. SAME—*a witness before the grand jury is protected against self-incrimination.* Proceedings before a grand jury are within the meaning of the constitutional provisions for due process of law and that "no person shall be compelled in any criminal case to give evidence against himself," and a person against whom charges have been preferred by the grand jury is entitled to a full and impartial hearing by the court although the proceedings are of necessity summary.

3. SAME—*a witness cannot claim privilege of silence to protect third party.* A witness cannot claim the privilege of silence for a purely fanciful or sentimental reason or for the purpose of securing from prosecution some third person who is interested in concealing the facts to which the witness could testify, as every citizen is bound to aid in the enforcement of the law and has no right to permit himself, under the pretext of shielding himself, to be made the tool of others who are desirous of seeking shelter behind his privilege.

4. SAME—*what evidence is to be regarded as incriminating a witness.* A witness cannot be compelled to answer a question if the proposed evidence has a tendency to incriminate him or to establish a link in the chain of evidence which may lead to his conviction, or if the proposed evidence will disclose the names of persons upon whose testimony the witness might be convicted of a criminal offense.

5. SAME—*when the witness has right to decide not to answer.* While it must appear to the court, from all the circumstances, that there is real danger to the witness from answering a question that may incriminate him and it is not enough for the witness to say that the answer will have that effect, still the witness has a right to decide for himself where the question is doubtful.

6. SAME—*person charged with contempt cannot be compelled to give evidence against himself.* One charged with criminal contempt is entitled to an orderly trial and is presumed to be innocent until his guilt is established beyond a reasonable doubt, and he cannot be compelled to give evidence against himself.

7. SAME—*judgment for contempt will be set aside if not supported by the record.* A court has no jurisdiction to punish for contempt where no contempt was committed, and where the record discloses that the judgment finding the accused guilty of contempt is without support it will be set aside.

WRITS OF ERROR to the Criminal Court of Cook county; the Hon. M. L. McKINLEY, Judge, presiding.

NASH & AHERN, and EUGENE L. McGARRY, (THOMAS E. SWANSON, and MICHAEL J. AHERN, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, and EDWARD C. FITCH, for the People.

Mr. CHIEF JUSTICE THOMPSON delivered the opinion of the court:

James J. Spain, an engineer in the employ of the board of education of the city of Chicago, was called before a grand jury of the criminal court of Cook county September 6, 1922, and interrogated for the purpose of ascertaining what he knew regarding the criminal activities of the mythical John Doe and others. From the nature of the questions it appears that the grand jury had reason to suspect that certain members of the board of education or certain members of the General Assembly, or both, were guilty of, conspiracy or bribery, or both. When the grand jury concluded its examination of him he was placed under arrest and held in custody until the following day. No charge was placed against him, and so far as this record shows he was unlawfully detained. September 7 he was taken from his place of confinement and again brought before the same grand jury, which seemed to be investigating the same un-

known persons.  He refused to answer some of the ques-
tions asked, on the ground that the answers might tend to
incriminate him.  He was again incarcerated without com-
plaint or warrant.  A petition for a writ of *habeas corpus*
was prepared in his behalf and presented to the chief jus-
tice of the criminal court.  The writ was ordered and was
made returnable before said judge at two o'clock P. M.,
Friday, September 8, 1922.  About one o'clock in the after-
noon of the same day Spain was again taken from his place
of confinement and again taken before the grand jury and
again questioned concerning the collection of certain funds
which it was charged had been collected for the purpose of
bribing members of the General Assembly and concerning
the payment of certain sums of money as bribes to certain
public officials.  Spain again refused to answer the ques-
tions on the ground that his answers might tend to incrimi-
nate him.  When the return was made to the writ of
*habeas corpus* the hearing was continued until the follow-
ing morning.  When Spain was brought before the court
on the writ on the morning of September 9 a motion was
made to quash the return.  The judge then declined to
hear the matter further, but proceeded, without any previ-
ous notice, to a hearing on a certain petition then filed in
the criminal court on the relation of the grand jury.  This
petition charged Spain with refusing to answer certain ques-
tions propounded to him before the grand jury concerning
John Doe and others whose names were unknown to the
grand jurors, and asked that he be ordered to "show cause
why he should not truthfully and fully answer said inter-
rogatories, and upon his refusal so to do, that he be held as
in contempt of court for his refusal to answer the said in-
terrogatories as aforesaid and be punished accordingly."

We gather from the questions and answers set out in
the record that the engineers employed by the board of
education had contributed over $75,000 for a fund for some
purpose, and that this money was kept in a certain safety

deposit box located in the Masonic Temple, in Chicago; that the money collected consisted principally of paper currency of small denominations; that the money was paid out for some purpose and later was returned to the fund in bills of large denominations, and that the fund was then deposited in another safety deposit vault.

The following are some of the questions which Spain declined to answer, on the ground that the answers might incriminate him:

Q. "How about the $1000 bills that are there? Did you take the money out,—ones and twos and fives,—and turn them into thousands, or are they now the same ones that the engineers gave in that day?

Q. "There are five or six $1000 dollar bills there now. Are they the same $1000 bills you had there when you took the money out of the Masonic Temple vault to the Greenebaum vault?

Q. "Are any of the $500 bills in there now the same bills you brought from the Masonic Temple vault?

Q. "Was there any money in that vault when you were there with the committee from the grand jury day before yesterday that was other or different money than that which you took from the Masonic Temple vault and put into Greenebaum's vault?

Q. "How long has that money been in that vault in Greenebaum's bank?

Q. "As a matter of fact, that money has been there only a few days. Isn't that a fact?"

The following are some of the questions asked and answers made:

Q. "Mr. Spain, did you give any person who was not a member of the board of education or who was not a member of the legislature any money out of this fund for the purpose of influencing the action of either the board of education or the legislature?

A. "Not to my knowledge.

Q. "Do you know of any individual having received any of this fund, either from you or any other person, for the purpose of influencing either the legislature or the board of education on the question of salary increase?

A. "Not to my knowledge.

Q. "In order that you can understand just what is in my mind: You say that you did not give any money to a member of the board of education, and you did not give any money,—you personally did not give any money,—to a member of the legislature. Is that right?

A. "That is right.

Q. "Now, did you give it to a third party?

A. "I gave it to no one that in my opinion would turn it back to the board of education or a member of the legislature.

Q. "Now, whom did you give that money to, then?

A. "I decline to answer on the ground that any answer might tend to incriminate me.

Q. "Did you give any of the money to a republican machine in Chicago?

A. "I decline to answer on the ground that any answer might tend to incriminate me.

Q. "If you did not give it to anybody to influence either the board of education or the legislature how could that answer incriminate you?

A. "I am a civil service employee and there are several angles to the Civil Service law that I have to be mighty careful about."

The inquisition continued along this and other lines. Questions were asked which insinuated that he had embezzled some $15,000 or $20,000 of the fund. He was asked how much salary he drew, how much it cost him and his family to live, what investments he had made, how he was able to make certain investments if he had no income other than his salary, and many other questions of an equally

searching character. Some of the questions he answered
and others he declined to answer on the ground that the
answers might tend to incriminate him. When the petition
was read in open court he was asked by the court if he had
heard the questions and answers read from the petition, and
when he replied that he had, the court asked him further,
"Are they the same questions and the same answers which
you made in the grand jury room when called as a witness
yesterday?" and he answered, "I think so." The rest of
the record is a disconnected dialogue between court and
counsel, in which counsel moved to quash the petition for
various reasons; requested a list of all the questions asked
and all the answers given during the examination of Spain
before the grand jury so that the court might be able to see
the full purport of the investigation; asked that the hear-
ing on the petition be continued so that Spain might have
time to prepare and file an answer to show cause why he
refused to answer the interrogatories; asked that Spain be
sworn and examined by the court with respect to his rea-
sons for refusing to answer the interrogatories,—all of
which was promptly overruled by the court. Without find-
ing that the questions were proper, relevant or material to
any matter then being considered by the grand jury, and
without finding that an answer to the interrogatories
would not have been incriminating, and without requir-
ing any showing that Spain's silence was not fully justi-
fied, and without requiring Spain to return to the grand
jury and answer the questions, the court summarily ad-
judged him guilty of contempt and ordered him to pay a
fine of $100 and to be imprisoned in the county jail for a
period of six months. At the conclusion of the contempt
proceedings an order was entered in the *habeas corpus* pro-
ceedings discharging Spain from the custody of the State's
attorney. From the judgment finding him guilty of con-
tempt and committing him to the custody of the sheriff
this writ of error is prosecuted.

No principle of the common law is more firmly established than that which affords a witness the privilege of refusing to answer any question when the answer will incriminate him. More than two and a half centuries ago Lord Camden, in his memorable decision in *Entick* v. *Carrington,* 19 How. St. Tr. 1029, which is regarded as one of the landmarks of English liberty, said: "It is very certain that the law obligeth no man to accuse himself, because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust." So thoroughly is the principle imbedded in the foundations of our government that it is to be found in varying language in the constitution of each of the forty-eight States and in the fifth amendment to the Federal constitution. The provision in the Federal constitution is a limitation on the Federal power only, and has no bearing on the case at bar except as the decisions of the Federal courts may throw light upon the general subject. The people of this State have declared by their constitution that "no person shall be deprived of life, liberty or property without due process of law," and that "no person shall be compelled in any criminal case to give evidence against himself." The provisions are aimed at the practice of subjecting persons to compulsory inquisitorial proceedings conducted to probe the conscience and induce a statement of incriminating facts bearing on the charge which is the subject of the inquiry. When a proper case arises, the constitutional provisions quoted should be applied in a broad and liberal spirit in order to secure to the citizen that immunity from every species of self-accusation implied in the brief but comprehensive language in which they are expressed. (*Counselman* v. *Hitchcock,* 142 U. S. 547, 12 Sup. Ct. 195; *Arndstein* v. *McCarthy,* 254 U. S. 71, 41 Sup. Ct. 26; *People* v. *Forbes,* 143 N. Y. 219, 38 N. E. 303; *People* v. *Reardon,* 197 N. Y. 236, 90 N. E. 829; *Ex parte Cohen,* 104 Cal. 524, 38 Pac. 364; *In re Beer,* 17 N. D. 184, 115 N. W.

672.) The security which they afford to all citizens against the zeal of the public prosecutor or public clamor for the punishment of crime should not be impaired by any narrow or technical views in their application to such a state of facts as appears from the record before us. Proceedings before a grand jury are within the meaning of these constitutional provisions. (*Boone* v. *People,* 148 Ill. 440; *People* v. *Argo,* 237 id. 173.) Of course, a witness cannot claim the privilege of silence for a purely fanciful or sentimental reason or for the purpose of securing from prosecution some third person who is interested in concealing the facts to which the witness could testify. Every good citizen is bound to aid in the enforcement of the law, and has no right to permit himself, under the pretext of shielding himself, to be made the tool of others who are desirous of seeking shelter behind his privilege. (*Brown* v. *Walker,* 161 U. S. 591, 16 Sup. Ct. 644; *In re Moser,* 138 Mich. 302, 101 N. W. 588.) In the famous Burr trial, Chief Justice Marshall said he understood the true rule to be this: "It is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such an answer may disclose a fact which forms a necessary and essential link in the chain of testimony which would be sufficient to convict him of any crime, he is not bound to answer it so as to furnish matter for that conviction. In such case the witness must himself judge what his answer will be, and if he say on oath that he cannot answer without accusing himself he cannot be compelled to answer." In the same case he said further: "Many links frequently compose that chain of testimony which is necessary to convict an individual of a crime. It appears to the court to be the true sense of the rule that no witness is compelled to furnish any one of them against himself. It is certainly not only a possible but a probable case that a witness by disclosing a single fact may complete the testimony against himself, and to a very

effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact, of itself, would be unavailing, but all other facts without it would be insufficient. While that remains concealed in his own bosom he is safe, but draw it from thence and he is exposed to a prosecution. The rule that declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description." The rule is firmly established that if the proposed evidence has a tendency to incriminate the witness or to establish a link in the chain of evidence which may lead to his conviction, or if the proposed evidence will disclose the names of persons upon whose testimony the witness might be convicted of a criminal offense, he cannot be compelled to answer. (*Minters* v. *People*, 139 Ill. 363; *Lamson* v. *Boyden*, 160 id. 613; *People* v. *Argo, supra; In re Beer, supra; Counselman* v. *Hitchcock, supra.*) While it is not enough for a witness to say that an answer will incriminate him, and while it must appear to the court, from all the circumstances, that there is real danger to the witness, the witness has the right to decide, where the question is doubtful. Respecting such a situation it was said in *People* v. *Forbes, supra:* "The witness who knows what the court does not know and what he cannot disclose without accusing himself must in such cases judge for himself as to the effect of his answer, and if to his mind it may constitute a link in the chain of testimony sufficient to convict him when other facts are shown, or to put him in jeopardy or subject him to the hazard of a criminal charge, indictment or trial, he may remain silent." See, also, *People* v. *O'Brien*, 176 N. Y. 253, 68 N. E. 353; *Wilson* v. *Ohio Farmers' Ins. Co.* 164 Ind. 462, 73 N. E. 892.

Applying these general principles to the case at bar, it appears at once that Spain was well within his rights when he demanded the privilege of silence. It is clear from a mere consideration of the questions propounded, in the

light of the circumstances disclosed, that they could not have been answered with impunity. It is generally known, and it does not seem out of place to state here, that Spain has been indicted for conspiracy to violate the Civil Service law, for conspiracy to bribe and for bribery. It appears, therefore, that his fear of criminal prosecution was not wholly unfounded. When Spain was brought before the court on the charges preferred against him by the grand jury he was entitled to a full and impartial hearing. Proceedings of this character are of necessity summary, but that does not prevent the courts from giving the accused all his rights under the law. He must be given the fullest opportunity to defend himself. (*Sherman* v. *People,* 210 Ill. 552; *Ex parte Sullivan,* (Okla.) ·138 Pac. 815.) Where one is charged with criminal contempt he is entitled to the same orderly trial accorded any other defendant. He is presumed to be innocent until his guilt is established beyond a reasonable doubt, and he cannot be compelled to give evidence against himself. (*State* v. *District Court,* (Minn.) 175 N. W. 908; *Gompers* v. *Buck's Stove and Range Co.* 221 U. S. 418, 31 Sup. Ct. 492.) A court has no jurisdiction to punish for contempt where no contempt was committed, and where the record discloses that the judgment finding the accused guilty of contempt is without support it will be set aside. (*Stuart* v. *People,* 3 Scam. 395; *Ex parte Thatcher,* 2 Gilm. 167; *Walton* v. *Develing,* 61 Ill. 201; *Ex parte Sullivan, supra.*) Without regard to manifest errors of procedure, it is clear that this judgment must be reversed on the merits.

Charles E. Driscoll was employed by the board of education in the same capacity as Spain and was called before the same grand jury and examined with respect to the same subject matter. He was likewise cited and found guilty of contempt for refusing to answer questions which he claimed would reveal matters tending to incriminate him. He likewise prosecuted a writ of error to review the judgment of

the criminal court. The cases were consolidated in this court. The questions presented in the *Driscoll case* are similar to those presented in the *Spain case*, and for the reasons already given the judgment will be reversed.

*Judgments reversed.*