(No. 26153.—

In re Eugene J. Holland, Attorney, Respondent.

*Opinion filed September 15, 1941.*

Charles Leviton, *amicus curiae.*

Schroeder & Simpson, and Werner W. Schroeder, for respondent.

Mr. Justice Stone delivered the opinion of the court:

This cause is here on the report of the commissioners of the Chicago Bar Association, authorized by rule No. 59 of this court to investigate the conduct of attorneys, recommending that the license of the respondent to practice law be suspended for a period of two years. Respondent has filed exceptions to that report and briefs have been filed and arguments made.

Respondent, at the time of the hearing, was a judge of the municipal court of the city of Chicago, having been first elected to that office in 1932. It appears that during November, 1939, the grand jury of Cook county was engaged in investigating the death of one Edward J. O'Hare who was killed a short time theretofore on the streets of Chicago. It appears also from a statement made by the respondent to the State's attorney, in the latter's office, that respondent had been associated with O'Hare and others in the purchase of certain properties, most of which had been disposed of. When called before the grand jury he refused

to sign an immunity waiver, but answered questions concerning the killing of O'Hare, declaring he knew nothing about it. Other questions were put to him pertaining to his association and business deals with O'Hare, which he refused to answer upon advice of counsel and under his constitutional rights.

Contempt proceedings were instituted before the criminal court of Cook county and a rule to show cause why he should not be adjudged in contempt was entered. Upon hearing, the court construed his objection to answering the questions before the grand jury, pertaining to his relationship with the deceased O'Hare as based upon section 10 of article 2 of the constitution which exempts any person from giving testimony against himself, or any testimony which might in any way tend to incriminate him, and discharged the rule. The commissioners, before whom the present inquiry against respondent was conducted, found that in claiming this constitutional privilege respondent was not acting in good faith; that there was a duty resting upon him as a lawyer and as a judge to aid in the investigation of the killing of O'Hare, and that because his claim of privilege was lacking in good faith, he should be disciplined.

The complaint does not seek, and indeed this court has no jurisdiction to bring about, the forfeiture of respondent's position as judge. He can be tried in this proceeding only as a lawyer and his actions judged by his duty as such while bearing the judicial responsibilities. As was held in *In re Burton,* 67 Utah, 118, 246 Pac. 188, respondent's judicial position does not relieve him from disciplinary proceedings, as the court deals only with his relation as attorney and in no sense with his judicial position. To the same effect is the case *In re Stolen,* 214 N.W. (Wis.) 397. This rule was by this court held applicable to a case involving a State's attorney. *People* v. *Phipps,* 261 Ill. 576.

The position of the commissioners appears to be that since respondent is a judge his right to retain his license

as a lawyer is subjected to additional or increased obligations to assist in the investigation conducted by the grand jury. While a judge may not hide behind his office in defense of an inquiry concerning his compliance with legal ethics and good morals, the proceedings here must be against him as a lawyer, and the demands of legal ethics applied to him in such capacity. *Amicus curiae* argues that it is bad faith on the part of a lawyer or judge to rely upon his constitutional privilege in a case such as this.

It appears from the record that respondent, reading in the press that the State's attorney had stated that he wanted him for questioning, called up the latter and arranged to confer with him. Such conference did take place the next day between respondent and the first assistant State's attorney, in which, as parties here agree, the utmost frankness and coöperation was shown by respondent in answering questions put by the assistant State's attorney. It appears that some two hundred and thirty-five questions were asked him; that he answered all of them fully except five, the answers to which he did not remember, and excepting five others the answers to which he said he would look up and report. It is conceded that none of the ten questions last referred to were of importance. He later appeared before the grand jury without *subpoena* and was immediately requested to sign an immunity waiver, which he refused to do. It appears from the record that the practice in Cook county, as known to respondent, had been to request witnesses before a grand jury to sign immunity waivers only in those cases where the prosecutor contemplated that the witness might be later indicted. Respondent testified before the grand jury that he knew nothing about the killing of O'Hare, but refused to answer questions relating to business transactions with the deceased. In the conference between him and the first assistant State's attorney respondent went fully into that relationship.

It appears from the statement made to the assistant State's attorney that respondent had known O'Hare for a

few years and that some time prior to the latter's death respondent, with a group of persons which included O'Hare, had purchased, at a bankruptcy trustee's sale, certain assets of Bain, Incorporated, which was a holding company for the Bain banks. These assets were sold at public sale and a large number of bidders participated. The sale was approved and corporations were formed to hold the title to the property. Respondent was an officer in these corporations. O'Hare was not.

Respondent states as reason for his claim of constitutional privilege and right to refuse to answer any questions pertaining to any business deals or relationship with the deceased, O'Hare, and the evidence tends to so show, that immediately after his conference with the State's attorney newspapers carrying heavy headlines attacked him with the statement that according to the assistant State's attorney, who had given out an interview concerning that conference, respondent had been vague in his answers and that his memory had failed him at times; that this was untrue, the only questions where his memory was at fault being the ten questions referred to herein, and that respondent freely told the assistant State's attorney that he, O'Hare and others, had purchased assets at the Bain bankruptcy sale for between $17,000 and $18,000, and sold them out at but little profit, yet the assistant State's attorney stated to the newspaper reporters that it was his recollection that the properties were worth many times that sum. Respondent says that as such statements were wholly untrue, and respondent had not been vague but frank with the assistant State's attorney, and in view of previous animosities between respondent and the State's attorney, growing out of political feuds of opposing factions in the same political party, respondent became suspicious that the State's attorney, instead of desiring to question him in the investigation as to the cause of the death of O'Hare, was seeking to investigate respondent. He states that he voluntarily

went to the State's attorney's office for questioning in the hope that political animosity of the past would not enter into the situation, but that he became convinced, from rumors, the attitude of the State's attorney's office, and the character of the newspaper interviews given out by the assistant State's attorney, that the State's attorney was seeking to investigate him. He called upon his counsel who advised him to claim his constitutional privilege if an immunity waiver was asked of him. The fact that his fears in the matter were not entirely unreal or fanciful is evidenced by the statement of the State's attorney on hearing before the commissioners that prior to this incident and subsequent thereto he had been and was investigating the respondent. Respondent further says that he knew of the practice of the State's attorney regarding the use of immunity waivers and the fact that he was asked to sign such waiver lead him to believe that the State's attorney had in mind his possible indictment. It is not denied that he answered freely all questions relating to any knowledge on his part of any facts regarding the killing.

Twenty-eight character witnesses, among them lawyers and judges of prominence, testified to respondent's good character as of long standing.

A large number of newspaper articles were introduced on the hearing before the commissioners. These articles bore upon the rumor that O'Hare had been "front man" for Capone, a notorious one time gang leader in Chicago; that it was rumored that the respondent was interested as a stockholder in a dog track in which O'Hare was interested, in Jacksonville, Florida, and numerous other inferences and rumors concerning respondent and O'Hare. These articles were introduced in evidence by the complainant on this hearing. Respondent also introduced certain newspaper articles as tending to show the reasonableness of his fear of antagonism on the part of the State's attorney against him. This record, however, contains no evidence concern-

ing the truth or falsity of the newspaper articles introduced. *Amicus curiae* says that the newspaper articles introduced by complainant were not offered as evidence of acts of the respondent but to show widespread rumors affecting his business activities, by reason of which rumors it was his duty to testify freely before the grand jury. Thus one of the serious questions is raised on this record,—*i.e.,* whether newspaper characterization and widespread rumor, unsupported by evidence, may require that a lawyer, or judge, in observance of legal ethics by which all lawyers are bound, answer questions submitted to him before a grand jury concerning such rumors, or other private matters not directly connected with a crime being investigated by that body.

*Amicus curiae* say it is not the desire of the complainant to deny respondent, as a lawyer, the right to, in good faith, exercise the privilege conferred by section 10 of article 2 of the constitution, but that his duty as a judge and a lawyer to aid in an investigation of crime, requires that he waive that privilege. They say here, also, that respondent did not exercise the constitutional privilege in good faith. In other words, as we understand the position of *amicus curiae,* it is that a lawyer, though possessing this privilege accorded by the constitution, has nevertheless an overshadowing duty as a lawyer to refuse to exercise it in a case such as this, and that his failure to so refuse renders him subject to discipline.

The tendency of the possessor of a right usually is to hold that right to be absolute, yet it is a matter of common understanding among those familiar with social and governmental structure that many human rights are surrounded by equally just principles out of which such claimed right can scarcely be said to have arisen, and upon which it may not be based, and those principles may so outweigh the right claimed as to prevent insistence upon it. But to make the general charge that the claimant of such a right

is guilty of contumacious conduct if he does not recognize as controlling those surrounding principles and forsake his right, is to measure him by an idealism which itself may ofttimes result in injustice, a result neither legally nor morally justified. The late Mr. Justice Cardozo in his Paradoxes on Legal Science, page 48, makes the statement that where government makes a declaration of right, such is "the admission by organized society that the claim is justified from the public point of view." That principle may be applied in a case of this kind. The right given by the constitution being legal, is as well a moral right, since the public point of view can scarcely be said to include that which is not moral.

In the case *In re Grae*, 282 N. Y. 428, 26 N.E. (2d) 963, the Court of Appeals of New York reviewed an order of the Appellate Division which suspended appellant from the practice of law, upon proof that, in an inquiry ordered by that court into certain alleged unlawful and unethical practices of members of the bar, he had refused to sign a waiver of immunity. The appellant, in explaining his refusal to sign such waiver, testified that though he had no fear that there was anything in the conduct of his professional life which would be productive of either criminal or disciplinary charges, yet, by reason of his years of practice as an attorney there might be engendered in the minds of certain individuals an unfriendly attitude toward him of such a nature as to produce criminal charges of which he was innocent, and that by reason of that fact and upon advice of counsel he had refused to sign the written waiver of immunity. After citing the decisions of that court in which it had been held that a lawyer may not claim privilege when making such claim as a pretext, and not in good faith, that court pointed out the difficulty in most cases of anticipating the effect upon a witness of his answer to a given line of inquiry, and said: "And so it has been ruled that, in the absence of conduct by a witness which is

clearly contumacious, the witness must be permitted to judge for himself as to the effect of his answer." It was there also pointed out that the findings of bad faith against the appellant were not supported by the record; that he had, on the contrary, expressed a willingness in open court to answer fully all questions at the direction of the court, and to produce his records. The New York court also said: "The privilege against self-incrimination is a constitutional guaranty of a fundamental personal right. Long regarded as a safeguard of civil liberty it was firmly imbedded in the law of England and by the fifth amendment to the Federal constitution became a basic principle of American constitutional law. 'It is a barrier interposed between the individual and the power of the government, a barrier interposed by the sovereign people of the State; and neither legislators nor judges are free to overleap it.' " Citing *Matter of Doyle*, 257 N. Y. 244. It was also there said: "Applying this basic principle to our present problem we have no doubt that when the appellant, as a witness upon the inquiry at the Special Term, declined to sign a waiver of immunity and thus refused to relinquish in advance a privilege which the constitution guarantees to him, he was within his legal right."

In *People* v. *Forbes*, 143 N. Y. 219, 38 N. E. 303, the relator had been found guilty of contempt for refusing to testify before the grand jury, while insisting upon his innocence. In that case it was argued that the relator could not be put in peril by his answers to the questions propounded, since he had already testified he had no connection with the matter. The court, however, did not agree with this conclusion, but said: "The testimony of the witness might be ever so strong and clear in favor of his innocence, but it did not conclude the public prosecutor, in the absence of some constitutional or statutory provision securing the relator from prosecution. The general statements of a person charged with crime in regard to his

innocence avail but little against incriminating facts and circumstances. His protestations of innocence, and his broad general denial of any knowledge of or connection with the transaction, might be overcome by facts and circumstances, if the district attorney could be permitted to draw them from the witness. Anyone who has had much experience in the conduct of criminal trials is aware of the fact that frequently the most dangerous proof that a person charged with crime has to meet are his own statements made for the purpose of warding off suspicion or of satisfying others with regard to his innocence. It is not unusual on such trials to confront the accused with his own declarations made for the very purpose of exonerating himself from all suspicion, but which, when all the evidence is collected, are so far at war with all the facts and circumstances as to furnish evidence of guilt." This is a succinct statement of an important reason for the constitutional safeguard. Without such safeguard any person, judge, lawyer or layman, may be forced to answer questions upon the mere suspicion of the public prosecutor, or in furtherance of a misuse of his discretion for political or other improper purposes; or he may be subjected to blackmail through threats of the unscrupulous to procure his prosecution.

The rule adopted in this State and as announced in *People* v. *Spain,* 307 Ill. 283, *People* v. *Boyle,* 312 id. 586, and other cases, is that while one called as a witness is not entitled to the privilege of silence by reason of fanciful excuse, or sentimental reasons, or for protection against an imaginary danger, or for the purpose of procuring immunity of some other person, yet the rule recognizes the importance of the long-existing constitutional right to protection against giving evidence against oneself. It was said in the *Spain case:* "When a proper case arises, the constitutional provisions quoted should be applied in a broad and liberal spirit in order to secure to the citizen that immunity

from every species of self-accusation implied in the brief but comprehensive language in which they are expressed."

In an opinion rendered by the Justices of the Supreme Judicial Court of Massachusetts, (*In re Opinion of Justices*, 300 Mass. 620, 15 N.E. (2d) 662), the Justices were considering the validity of a proposed statute, providing that if a defendant failed to testify and the court was satisfied it would have been within his power, if not guilty, truthfully to contradict material evidence, the court might, in its discretion, instruct the jury that the defendant's failure to testify might be taken into consideration. The Justices held, quoting from *Twining* v. *New Jersey*, 211 U. S. 78, 53 L. ed. 97, that " 'The exemption from testimonial compulsion, that is, from disclosure as a witness of evidence against onself, forced by any form of legal process, is universal in American law, though there may be differences as to its exact scope and limits. At the time of the formation of the Union the principle that no person could be compelled to be a witness against himself had become embodied in the common law and distinguished it from all other systems of jurisprudence. It was generally regarded then, as now, as a privilege of great value, a protection to the innocent, though a shelter to the guilty, and a safeguard against heedless, unfounded, or tyrannical prosecutions.' * * * That shield is positive and unequivocal. It is subject to no condition. It rests wholly upon the volition of the defendant whether he shall fail to interpose it, or not."

Complainants say that they are not contesting the right of respondent to claim his privilege but they say that his duty to refuse to do so is of sufficient importance to require that he be disciplined if he claims the privilege. We are unable to follow the argument of counsel that this would not result in a limitation such as was condemned in *In re Opinion of Justices* just referred to. To say that one has an absolute right to a privilege, but if he exercise it he will

be punished, is to limit his enjoyment of that right, and unless the circumstances surrounding him or duties placed upon him are of such character as to require, in honesty and good conscience, that he waive the right, we are unable to see wherein it can be said that an individual, be he judge, lawyer or layman, is either legally or morally guilty of a wrong should he claim the right.

*Amicus curiae* has cited cases where police officers were sought to be disciplined because they refused to answer questions put to them on the ground of constitutional privilege. In such cases it was recognized that the officer was especially charged with the duty to prevent crime and to disclose any evidence that would assist in the apprehension of criminals. The court said, in *Christal* v. *Police Commission of San Francisco,* 33 Cal. App. 564, 92 Pac. (2d) 416, where the respondent, a policeman, claimed the right of free speech, when charged with having given advance information of a police raid: "One of the most cherished rights guaranteed by the constitution is that of freedom of speech, yet no one would maintain that a police officer could fully exercise that right without violating the duties imposed upon him by the acceptance of his employment as a police officer."

In *Souder* v. *City of Philadelphia,* 305 Pa. 1, 156 Atl. 245, also cited by *amicus curiae,* Souder, a captain of police, refused to answer questions concerning certain transactions in his department, on the ground of his constitutional privilege. It was held that in such case his duty was to comport himself as an officer in such a manner that no act of wrongdoing should attach itself to him, and that by refusing to answer he was guilty of conduct unbecoming an officer. In *Scholl* v. *Bell,* 125 Ky. 750, 102 S.W. 248, where police officers, who were being interrogated as to the existence of crime, refused to answer on advice of counsel, it was held that as they were being interrogated as to the existence of crimes they were paid to prevent, if possible,

and to expose and punish if committed, such officers should not be held entitled to exercise the privilege and retain their role as police officers.

In the case *In re Harriss,* 364 Ill. 290, the respondent was a judge of the city court of Duquoin. One Helen Jackson was arraigned before him on a murder indictment. She was not represented by counsel and pleaded guilty. Thereafter, respondent accepted money from her, which she at least considered a fee, to appear before the parole board in an endeavor to obtain a pardon for her. It was held his conduct was such as was calculated to bring the legal profession and the judiciary into disrepute. The acts there involved were judicial acts and it was indeed appropriately there said that the acts of a judge should at all times be above suspicion and that the respondent was deserving of the court's strictest censure and condemnation.

It can scarcely be said that the duty resting upon a lawyer to assist in investigation of crime, a duty with which he is generally though not specifically charged, as is a policeman, outweighs, when considered from the standpoint of legal ethics, his moral as well as legal right to claim the constitutional privilege herein referred to in cases where he, in good faith, fears that he, though innocent, may be subjected to criminal prosecution. It has always been considered by this court that good faith on the part of an attorney at law is to be required in all matters where his conduct is called into question. Good faith lies at the very foundation of his relationship as a lawyer to the public and to the courts. These observations apply with increased force where a lawyer assumes the responsibilities of a judge.

Respondent urges that he in good faith feared that the State's attorney was seeking to indict him. We are unable to say, in view of the circumstances surrounding him, that the fears he expressed were unreal or fanciful. There is no evidence in this record that the deceased, O'Hare, was in any way connected with so-called gangsters but, on the contrary, the evidence offered on this hearing shows him

to have been a man of prominence and standing and of good reputation in the business and social world. In the admittedly free and frank statement respondent made to the assistant State's attorney there is no evidence of wrongdoing on his part. There is no evidence in this record of any judicial or personal act on his part showing moral turpitude and under such circumstances, unless it can be said that his duty as a lawyer required that he answer any and all questions put to him at a grand jury hearing, and that such duty is one which he cannot, under the facts of this case, refuse to follow, he cannot be held to discipline. For the purposes of this inquiry this court is governed by the record in that matter.

Judges are not expected to be ignorant of those things which other men, through association and concourse with others in similar walks of life, well know. While it is not to be construed as the opinion of this court that respondent's fears of an unjust prosecution are well founded, and we express no opinion in that regard, yet the facts hereinabove referred to, as well as the common knowledge of those familiar with the processes of the criminal law, that such processes have at times been used for purposes not founded on the furtherance of justice, must be considered in determining respondent's good faith in fearing indictment.

As was said in *In re Grae, supra,* "In the absence of conduct by a witness which is clearly contumacious, the witness must be permitted to judge for himself as to the effect of his answer." While this court does not commend respondent's judgment nor his course of conduct in this matter, we are of the opinion that this record does not support with required clarity the charge that his refusal to waive his constitutional privilege was lacking in good faith. We are of the opinion, therefore, that the rule should be discharged.

*Rule discharged.*