COMMONWEALTH *vs.* SARAH PRINCE
(and two companion cases against the same defendant).

Plymouth.   November 2, 1942. — February 15, 1943.

Present: FIELD, C.J., DONAHUE, QUA, COX, & RONAN, JJ.

*Minor. Constitutional Law,* Freedom of the press, Religion, Police power, Public place, Self incrimination. *Way,* Public: distribution of literature, "street trade." *Sale,* By minor.

A finding of guilt under the first sentence of G. L. (Ter. Ed.) c. 149, § 69, as amended by St. 1939, c. 461, § 7, would be warranted by evidence that a girl nine years of age carried on a public street a "magazine bag" marked "5¢ a copy" and containing religious magazines which she offered for "contributions" of five cents or more each, notwithstanding further evidence that she was not selling the magazines, that one could obtain a copy without paying five cents, and that the distribution of the magazines was a religious and charitable enterprise not carried on for profit; and such evidence also warranted a finding of guilt under §§ 80, 81, of a custodian of the girl who gave her the bag and the magazines and told her "where to stand."

A technical employment of a minor for a wage is not an element of the offences defined by G. L. (Ter. Ed.) c. 149, §§ 80, 81, respectively, of furnishing an article to the minor with knowledge of his intent to sell it in violation of § 69, as amended, and, on the part of a custodian in control of the minor, of permitting him to work in violation of said § 69.

As applied to a sale of religious magazines, the provisions, enacted under the police power, of G. L. (Ter. Ed.) c. 149, § 69, as amended, forbidding the sale by certain minors of magazines and other merchandise in streets and other public places, and of §§ 80, 81, establishing respectively the offence of furnishing such merchandise to a minor with knowledge of his intent to sell it in violation of § 69, as amended, and the offence, on the part of a custodian in control of a minor, of permitting him to work in violation of said § 69, do not violate the constitutional guaranties of freedom of the press and freedom of religion.

The provision of art. 12 of the Declaration of Rights against self incrimination would be violated by punishment of a defendant under G. L. (Ter. Ed.) c. 149, § 79, for his refusal to give a supervisor of attendance the name of a minor in the defendant's custody who was selling merchandise in violation of § 69, as amended, where testimony by the minor when found would furnish complete proof of the defendant's guilt of violations of §§ 80, 81, for which he was prosecuted contemporaneously with the prosecution under § 79.

THREE COMPLAINTS, received and sworn to in the District Court of Brockton on January 2, 1942.

Upon appeal to the Superior Court, the cases were heard without a jury by *Hayes*, J., a District Court judge sitting under statutory provisions. The defendant was found guilty on each complaint, and alleged exceptions.

*A. A. Albert*, for the defendant.

*E. R. Dewing*, District Attorney, & *R. G. Clark, Jr.*, Assistant District Attorney, for the Commonwealth, submitted a brief.

QUA, J. There was evidence tending to show the following: On the evening of the day named in each of these three complaints the defendant was on a public street in Brockton with her niece, one Betty M. Simmons, a girl in her ninth year, of whom the defendant was the custodian. Both the defendant and the child belonged to a religious sect known as "Jehovah's Witnesses" and as such regarded themselves as "ordained ministers" of God. Betty carried a "magazine bag" on which was printed "Watchtower explains the Theocratic Government" "5¢ a copy." In the bag were copies of the religious publications "Watchtower" and "Consolation." Betty held up a copy of each in her hand. She testified that she was "taking contributions" of five cents for each magazine, or more "if people should give more"; that she was not selling them; that on that night she did not receive any contributions or give any magazines away; that when she had received "contributions" she gave all the money to the defendant; and that the defendant had given her the bag and the magazines. The defendant admitted at the trial that she had given Betty the bag and the magazines and testified that she told Betty "where to stand."

There was further testimony by the defendant and witnesses called by her to the effect that a person interested could obtain a copy of a magazine without paying the five cents; that the enterprise of distributing the magazines was not carried on for profit but was a religious and charitable enterprise; and that she and her children were on the street corner for no other reason "but to tell the people of the one place of safety, that is in the kingdom of God under Christ that we have prayed for."

There was also evidence from which it could have been found that on the evening in question the defendant, when asked by the supervisor of attendance to give him Betty's name, refused to do so, although she knew he was such officer and that he desired the name to aid in the enforcement of the law. There was evidence that the supervisor insisted that he did not already know Betty's name; that during the interview he said that he had a right to arrest the defendant; and there was evidence that on a previous occasion he had explained to her that it was against the law to allow children on the street selling magazines.

General Laws (Ter. Ed.) c. 149, § 69, as amended by St. 1939, c. 461, § 7, provides in part 'that "No boy under twelve and no girl under eighteen shall sell, expose or offer for sale any newspapers, magazines, periodicals or any other articles of merchandise of any description, or exercise the trade of bootblack or scavenger, or any other trade, in any street or public place." Section 77 provides that §§ 69 to 73 shall be enforced by supervisors of attendance and police officers and vests the former with "full police powers for the purpose." Section 79 provides in part that any person "who refuses to give" to a supervisor of attendance "such information as may be required for the proper enforcement of sections sixty to seventy-four, inclusive, shall be punished . . . ." Section 80 provides that "Whoever furnishes . . . to any minor any article of any description with the knowledge that the minor intends to sell such article in violation of any provision of sections sixty-nine to seventy-three, inclusive . . . shall be punished . . . ." Section 81 provides that "Any . . . cus-

todian having a minor under his control who . . . permits such minor to work in violation of any provision of sections sixty to seventy-four, inclusive . . . shall . . . be punished . . . ."

One Perkins, supervisor of attendance of the schools of Brockton, made these three complaints against the defendant charging respectively that on December 18, 1941, at Brockton the defendant (first complaint, for violation of § 79) "did refuse to give to George S. Perkins, attendance officer of said Brockton, certain information, to wit: the name and age of Betty M. Simmons, a minor under the age of eighteen years, such information being required for the proper enforcement of the law"; (second complaint, for violation. of § 80) "did furnish to one Betty M. Simmons, a girl under the age of eighteen years, certain articles, to wit: magazines, she, the said Sarah Prince well knowing that the said Betty M. Simmons was to sell the said magazines unlawfully"; and (third complaint, for violation of § 81) "was the custodian of Betty M. Simmons, a minor, and did permit the said Betty M. Simmons to work contrary to law." Upon appeal to the Superior Court the complaints were tried by a judge without a jury, who found the defendant guilty on all three complaints.

The questions presented in various forms by the defendant's exceptions and argued before us are whether there was any evidence to warrant the findings that the defendant had violated the statutes as charged, and whether on their face, or as applied in these cases to the facts that could warrantably be found, the statutes underlying the three complaints are unconstitutional.

The defendant's contention that the statutes involved do not apply to her activities and those of Betty rests in general upon the argument that these statutes were aimed at the regulation of street trades of well known types commonly carried on by children for money, and that they were not intended to regulate the distribution without profit of religious publications by those who regard the spreading of their beliefs in this way as a command of God and hence as a religious and moral duty. We are not convinced that this

contention is sound. By way of caution we must remember that the trial judge might not have accepted as wholly true the testimony of the defendant and her witnesses as to their religious beliefs or as to the philanthropic character of their undertaking. But if he accepted it in full, we still think a finding was warranted that the law had been violated. It is no doubt true in a broad sense that the statutes were directed at the regulation of certain ordinary street trades. But this will not justify us in excluding from their operation acts that come within their literal terms and that may involve the very evils intended to be curbed. To do this would be to rewrite the statutes and to insert in them exceptions which the Legislature could have inserted if it had desired that such exceptions should exist. The acts of the defendant could well be found to fall within the literal terms of the statutes and within the allegations of the complaints. Section 69, as amended, contains no exception as to religious magazines. Its words are "any newspapers, magazines, periodicals or any other articles of merchandise of any description." The judge could find that if a passerby should hand over five cents in accordance with the sign on the bag and should receive a magazine in return, a sale would be effected. The judge was not required to accept the defendant's characterization of that transaction as a "contribution." He could believe that selling the literature played a more prominent part in the enterprise than giving it away. He could find that the defendant furnished the magazines to Betty, knowing that the latter intended to sell them, if she could, in violation of § 69. There is nothing in that section that restricts its scope to selling with an ultimate net profit in view. There is nothing in any of the sections on which these complaints rest that requires an employment of the minor, in the sense in which the word employment is used in the law of master and servant, as a condition of criminal responsibility. The judge could find that the defendant permitted Betty to "work" in violation of § 81. The "work" mentioned in § 81, in so far as that section refers to § 69, is the selling, exposing or offering for sale prohibited by § 69, whether or not that is carried on

under a technical employment or for a wage. And, finally, we cannot say that the evils at which the statutes were directed attendant upon the selling by children of newspapers, magazines, periodicals, and other merchandise in streets and public places do not exist where the publications are of a religious nature. It seems apparent that they may or may not exist in particular instances according to the circumstances just as they may or may not exist in particular instances according to the circumstances where the selling is of publications of a secular nature. The defendant has called to our attention a number of decisions holding that variously worded statutes relating to pedlers and other vendors were not intended to apply to the activities of "Jehovah's Witnesses." Perhaps of these cases the one nearest to the present case is *State* v. *Richardson*, 92 N. H. 178. But we cannot regard any of them as decisive of the true construction of our own statutes.

We are of opinion that these statutes as here construed do not infringe upon the constitutional guaranties of freedom of the press and of religion. Under our constitutional system freedom of the press and freedom of religion are rightly accorded a highly preferred position in the struggle of competing interests, but it does not follow that the channels through which these freedoms are exercised may not be affected and regulated in some degree by enactments under the constitutional powers of government designed to promote the public health, safety or welfare. The statutes under which these prosecutions are brought are derived from sections first enacted as part of St. 1913, c. 831. That statute was entitled "An Act to regulate the labor of minors." Its title correctly indicates its content. It contains many sections obviously intended to protect children against hazardous occupations, to insure that they shall not be permitted to work in particular trades or processes or at hours considered detrimental to the health or morals of minors of various ages, and to secure proper school attendance. Certain sections are devoted to "Street Trades." These provisions belong to a type of legislation long regarded as within the duty of the State to protect the health,

morals, and welfare of its people. *Commonwealth* v. *Hamilton Manuf. Co.* 120 Mass. 383. *Commonwealth* v. *Riley,* 210 Mass. 387, affirmed, *Riley* v. *Massachusetts,* 232 U. S. 671. *Commonwealth* v. *John T. Connor Co.* 222 Mass. 299. *Muller* v. *Oregon,* 208 U. S. 412. There have been examples of such legislation in this Commonwealth for a century. See St. 1842, c. 60. We think that freedom of the press and of religion is subject to incidental regulation to the slight degree involved in the prohibition of the selling of religious literature in streets and public places by boys under twelve and girls under eighteen and in the further statutory provisions herein considered, which have been adopted as means of enforcing that prohibition. These cases are within the principle of such recent decisions as *Commonwealth* v. *Pascone,* 308 Mass. 591, 594–598, certiorari denied, 314 U. S. 641; *Cox* v. *New Hampshire,* 312 U. S. 569; *Valentine* v. *Chrestensen,* 316 U. S. 52; *Manchester* v. *Leiby,* 117 Fed. (2d) 661, certiorari denied, 313 U. S. 562; and *Busey* v. *District of Columbia,* 129 Fed. (2d) 24. Moreover, it would seem that the statutes as applied in the cases now before us are constitutional under all the opinions in *Jones* v. *Opelika,* 316 U. S. 584. The cases of *Lovell* v. *Griffin,* 303 U. S. 444, *Hague* v. *Committee for Industrial Organization,* 307 U. S. 496, *Schneider* v. *State,* 308 U. S. 147, and *Cantwell* v. *Connecticut,* 310 U. S. 296, upon which the defendant relies, seem to us distinguishable.

The defendant makes the further contention as to the first complaint (for refusing to give the attendance officer the name and age of Betty Simmons) that she is now to be punished for refusing to furnish evidence against herself. This contention requires examination. Article 12 of the Declaration of Rights of the Commonwealth provides in part that "No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself." In *Emery's Case,* 107 Mass. 172, at page 182, Mr. Justice Wells, speaking with the approval of all members of this court, said that the clause "or furnish evidence against himself" "may be

presumed to be intended to add something to the significance of that which precedes." He continued, "Aside from this consideration, and upon the language of the proposition standing by itself, it is a reasonable construction to hold that it protects a person from being compelled to disclose the circumstances of his offence, the sources from which, or the means by which evidence of its commission, or of his connection with it, may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him. For all practical purposes, such disclosures would have the effect to furnish evidence against the party making them. They might furnish the only means of discovering the names of those who could give evidence concerning the transactions, the instrument by which a crime was perpetrated, or even the *corpus delicti* itself." He added that "Both the reason upon which the rule is founded, and the terms in which it is expressed, forbid that it should be limited to confessions of guilt, or statements which may be proved, in subsequent prosecutions, as admissions of facts sought to be established therein." There was no evidence that the defendant was asked Betty's age. Plainly her conviction on the first complaint was based solely upon her refusal to disclose Betty's name. It might be argued that Betty's name in itself had no tendency to incriminate the defendant, and was not an element of proof in the prosecution against her. On the other hand, the course of the evidence at the trial, including Betty's own testimony, made it clear that she was a witness who could, if the defendant were guilty, testify to every single element of proof necessary to convict the defendant on the second and third complaints. Moreover, by the terms of the statute upon which the first complaint is based the right of the supervisor of attendance to compel the defendant to answer his question was predicated upon the assumption that the answer was "required for the proper enforcement of sections sixty to seventy-four, inclusive." Under the circumstances of this case an answer to the question would have furnished to the Commonwealth ready means for producing all the evidence required to convict the defendant

upon the second and third complaints. The supervisor of attendance was in effect asking the defendant to help him secure the Commonwealth's principal witness in order to prosecute the defendant. If the defendant can be convicted for not answering such a question, why could not a statute be enacted in effect requiring every person suspected of crime to furnish the police a list of all the witnesses whose testimony would convict him? We do not see how we can uphold the present conviction on the first complaint without overturning the construction of the Constitution given after careful consideration in *Emery's Case.* We are not ready to take that step. *People* v. *Argo,* 237 Ill. 173. *People* v. *Spain,* 307 Ill. 283, 291. *People* v. *Newmark,* 312 Ill. 625, 632. *State* v. *Farmer,* 46 N. H. 200, 202. *Counselman* v. *Hitchcock,* 142 U. S. 547, 585.

The result here reached under the circumstances of this case does not mean that a witness can refuse to testify to every fact, harmless in itself, which by any possibility might in the course of further investigation lead to the discovery of other facts and so finally to the unearthing of some evidence having a tendency to incriminate him. This decision rests upon the facts of this case and upon the direct connection between the question asked and the securing of the evidence required to convict upon the second and third complaints, so that here if the defendant had answered it could truly have been said that she herself had helped to furnish the incriminating evidence.

It does not necessarily follow from what has been said that the duty of keeping records of, or of disclosing, certain specified acts, or of disclosing the mere identity of the actor or of the instrumentality employed by him, imposed by certain statutes upon persons engaged in certain occupations or persons accepting licenses or others, where the duty is not dependent upon any criminal quality in the facts required to be recorded or disclosed, violates the Constitution. Thus statutes imposing a penalty upon the driver of a motor vehicle who goes away after an accident without making known his name and the number of his vehicle (see G. L. [Ter. Ed.] c. 90, § 24, as amended) have

been held not to require self incrimination.   *Ule* v. *State,* 208 Ind. 255.   *Ex parte Kneedler,* 243 Mo. 632.   *State* v. *Sterrin,* 78 N. H. 220.   *People* v. *Rosenheimer,* 209 N. Y. 115.   See *Commonwealth* v. *Horsfall,* 213 Mass. 232; *Opinion of the Justices,* 271 Mass. 582, 595–596; *United States* v. *Sullivan,* 274 U. S. 259; *United States* v. *Mulligan,* 268 Fed. 893.   It would be impracticable to attempt at this time a full discussion of the possible distinctions.   The subject is treated at large in Wigmore on Evidence, (3d ed.) §§ 2259c, 2259d.

The result is that the defendant's exceptions are sustained in the first case (under § 79) and are overruled in the other cases.

*So ordered.*