People of the State of Illinois ex rel. John S. Rusch, Appellee, v. Albert Ferro et al., Appellants.

Gen. No. 41,404.

Opinion filed February 10, 1942. Rehearing opinion filed and rehearing denied February 25, 1942.

JOSEPH T. HARRINGTON, of Chicago, for appellants.

THOMAS J. COURTNEY, State's Attorney, for appellee; JOHN F. CASHEN, JR., of Chicago, of counsel.

MR. PRESIDING JUSTICE SCANLAN delivered the opinion of the court.

This is an appeal brought by Albert Ferro, Mary Nadine Segvich and Frank Guinta to reverse a judgment of the County court finding them guilty of contempt of the County court of Cook county. The judgment order sentenced respondents Ferro and Guinta to two years in the County jail and sentenced Mary Nadine Segvich to pay a fine of $1,500, and upon her failure to pay said fine that she be committed to the county jail of Cook county "until the said fine is satisfied, or paid, either by payment or service in the County Jail, said fine to be reduced at the rate of $3.00 for each day spent in the County Jail." The trial

court found that Russell Ciamprone and Agnes
Scheurer, respondents, had purged themselves of con-
tempt and discharged them.

On April 4, 1939, a City election was held in the
City of Chicago "for the election of various candidates
for various city offices." The following named persons
served as judges and clerks in the 53d precinct of
the 11th ward in Chicago: Albert Ferro, Democratic
Judge; Mary Nadine Segvich, Republican Judge;
Frank Guinta, Republican Judge; Russell Ciamprone,
Democratic Clerk, and Agnes Scheurer, Republican
Clerk. On December 2, 1939, John S. Rusch, Chief
Clerk of the Board of Election Commissioners of the
City of Chicago, filed a verified petition charging the
said five election officials with having knowingly,
fraudulently and unlawfully (1) made a false canvass,
(2) allowed illegal voting, (3) used dummy tally
sheets, (4) allowed ballots to be taken from the polling
place, (5) given illegal assistance to voters, (6) per-
mitted outsiders to handle ballots, (7) permitted out-
siders to change ballots, and (8) certified untrue re-
turn of votes cast. The respondents who were found
guilty, and who will hereafter be referred to as re-
spondents, filed a motion to quash or strike the peti-
tion and assigned many grounds in support of the
same.

Respondents contend that the evidence shows that
the integrity of the ballots as evidence had been de-
stroyed and that the court erred in admitting the
ballots in evidence; that the findings and judgment
of the trial court are contrary to the competent evi-
dence. The three judges and the two clerks testified
that there were no alterations or changes made upon
any ballots by the judges or anyone else and that all
of the erasures and alterations appearing upon the
ballots at the time of the hearing were not upon the
ballots when they were counted, wired and sealed in
the ballot boxes on April 4, 1939; that after the polls

were closed the only persons present in the polling place besides the officials were Tom Pellegrino, Joseph Munizzo and Carl Biandi, Democratic watchers; John Fratto, a Republican watcher; and Howard Anderson, a Chicago police officer. All of said last mentioned persons testified that they were standing or sitting about the table upon which the ballots were counted; that they watched the counting of the ballots; that there were no ballots marked or erasures made upon any ballot by any of the respondents or by anyone else; that no ballots were taken away from the table at any time during the count; that no one but the judges touched the ballots during the count; that it would have been impossible for a ballot to have been marked or an erasure made upon it without their knowledge. The respondents also contend that the direct testimony of the respondents and the five disinterested witnesses was not shaken upon cross-examination, and that no eyewitness to the count testified to any fact or circumstance that would tend to show that respondents failed to comply with the law in the performance of their duties as judges of election.

Both sides agree that upon the recount of the ballots before the trial court during the present proceedings 37 of the ballots showed erasures and alterations. On December 19, 1939, during the trial of the cause, respondents, as witnesses, recounted the ballots. They testified, *inter alia,* that the erasures and alterations which appeared upon the said ballots were not upon the ballots when they counted, tallied and deposited them in the ballot boxes on the night of the election. The petitioner contends that the testimony of respondents and the other witnesses as to what occurred in the polling place is ''unadulterated perjury'' and would not ''convince anyone with an ounce of sense,'' and that ''in this case the ballots are the only evidence of the respondents' corruptness and in themselves establish clearly and convincingly the guilt of the

respondents of contempt of the County Court.'' The implication in petitioner's contention has not deterred us from giving the testimony of respondents and the other witnesses due consideration; at the same time, we have borne in mind that the ballots are the better evidence if their integrity, as evidence, has been properly preserved. Who were the respondents and the other witnesses who testified as to what occurred in the polling place? Albert Ferro, a respondent, was 26 years of age, married, and working as a truck driver for a commercial contracting company. He had lived in the neighborhood in question all his life and had served as a precinct election official at two prior elections. Mary Nadine Segvich, a respondent, was 25 years of age, lived in the neighborhood, and her husband, John S. Segvich, was an assembler, employed by John H. Kenney & Company. She had served as a judge of election in the same precinct at the Primary election in February, 1939. Frank Guinta, a respondent, had lived at 3258 Princeton avenue for 14 years. He was a truck driver for the Consolidated Freight Company and had been so employed for 8 years. He had served as an election official at the February, 1939, Primary election. Russell Ciamprone, a respondent, was 23 years of age and lived at 3252 South Wells street, where he was born. He was a chauffeur for Frederick Brothers, at 5959 South Lowe avenue. Respondent Scheurer, a clerk at the election, resided at 3207 South Shields avenue. She also served as an election official at the February, 1939, Primary and was well known in the Election Commissioners' office. Before the election in question she went to the Election Commissioners' office and asked to be appointed a watcher at the election. The Board, of its own motion, appointed her a clerk. Tom Pellegrino, a Democratic watcher, lived at 3211 South Wells street with his wife and children and was a truck driver employed by Ostermoor & Company. He finished his work as a

truck driver at 4:30 p.m., April 4, 1939, and arrived at the polling place just before the polls closed and presented his credentials as a watcher. Joseph Munizzo, a Democratic watcher, lived at 325 West 31st street. He is a lawyer and at the time of the election was an Assistant Attorney General of the State of Illinois, a position that he had filled for three and one-half years. Carl Michael Biandi, a witness on behalf of respondents, was a Democratic watcher at the election. He resided at 3222 South Wells street, where he had lived for 23 years. He was 30 years of age, married, and his family consisted of his wife and two daughters. He was employed by the City of Chicago in the Bureau of Water and had been so employed for 7 years. John Fratto lived at 3256 Princeton avenue. He was acting as a watcher for Dwight Green and had acted in the same capacity at the Primary election in February. Howard Anderson, who was 35 years of age, and lived at 7501 South Detroit street, had been a police officer for 11 years, and did not know that he was to be assigned to the precinct in question until the day before the election. No attempt was made to attack the reputation of any of the respondents or the other witnesses, and so far as the record shows they were all industrious, law-abiding citizens. After midnight, on December 3, 1939, all of the respondents, without warning of any kind, were arrested and confined for about ten hours; were then taken into the County court, notified of the filing of the petition against them, and admitted to bail. Mrs. Segvich was awakened from her sleep and arrested; she was obliged to leave at home a baby fifteen months old.

Respondents contend that the trial court, at the outset of the hearing, before any evidence had been heard, manifested plainly that he had a wrong theory of the law that governed the proceeding; that he started the hearing presuming the respondents guilty and requiring them to prove their innocence, and if

they failed in that regard they would be found guilty. This contention seems to be well founded. At the commencement of the hearing respondents' counsel called the court's attention to the fact that he had filed a motion to dismiss or quash the petition. The following then occurred: ''The Court: I understand the whole case, Mr. Harrington. The court is proceeding on the theory there is a violation in that the officials were guilty of misconduct or misbehavior in office. I have ruled that this [the motion] cannot be filed because the theory of the case is there has been fraud committed. Mr. Harrington: How do you know that, Judge? The Court: Because the charges are here *and the evidence is here.* It makes no difference whether it is 6 weeks or 6 months from now. *As a matter of fact these men have been performing their services, they have not done the right thing, and certain votes have not been properly tallied.* Mr. Harrington: How do you know that? The Court: That is the theory upon which I am proceeding. We are laying the proof before them, if they cannot make an explanation—Perhaps they have a good explanation—If not, then they will be found guilty. Let's call these people [the respondents] up and let's bring in the evidence [the ballots] and see what they have done. Mr. Harrington: I would like to know, Judge. The Court: All right. In other words I will rule on the motion to quash and to strike the petition, which is denied, and leave to file is denied.'' The respondents who were judges of election, Ferro, Guinta and Segvich, were then called to the stand and examined by the court.

In *People v. Spain*, 307 Ill. 283, 292, the court, in stating the rights of a respondent in criminal contempt matters, said: ''Proceedings of this character are of necessity summary, but that does not prevent the courts from giving the accused all his rights under the law. He must be given the fullest opportunity to

defend himself. (*Sherman v. People,* 210 Ill. 552; *Ex parte Sullivan,* (Okla.) 138 Pac. 815.) Where one is charged with criminal contempt he is entitled to the same orderly trial accorded any other defendant. He is presumed to be innocent until his guilt is established beyond a reasonable doubt, and he cannot be compelled to give evidence against himself.'' We have referred to the *Spain* case because it cites *Sherman v. People, supra,* in support of its statement of the law. The *Sherman* case involved a proceeding brought under the Election Act of 1885 to punish election officials for misbehavior as judges of election during a judicial election held June 1, 1903. In that case respondents, represented by William S. Forrest, an able and distinguished lawyer, contended that the provisions of the statute authorizing the court to proceed to hear the case without an affidavit or formal statement in writing as to the nature of the charge or accusation, without formal pleadings and upon oral testimony, in a summary manner, was unconstitutional, as it deprived respondents of their liberty without due process of law. The court, in answer to this contention, said (pp. 559, 560): ''It is the intention of the act that proceedings under it shall be summary, vigorous and effective. The provisions complained of were enacted, evidently, for the purpose of preventing the delays which very formal proceedings require. There is nothing in the act to prevent the defendants from having all their rights under the law. The provisions must be given a reasonable construction. Under them the defendants are entitled to a full and impartial hearing, not only as to the exact nature of the charges against them, but they must be given the fullest opportunity of offering evidence in their own defense. After the case has been tried the defendants still have their right of appeal, where any errors which have been committed may be corrected.'' The majority of the court held that the provision in question was not

unconstitutional. (Cartwright and Scott, JJ., dissented.)

In a proceeding like the instant one the respondents are presumed to be innocent, and the burden is upon the petitioner to prove them guilty of the charge. They are, of course, entitled to a fair and impartial trial, and it would seem hardly necessary to state that the trial court, who was called upon to pass upon the guilt or innocence of respondents, should not assume the role of a prosecutor. Nor does the fact that the statute provides that the proceeding is to be tried in open court on oral testimony, in a summary way, without formal pleadings, authorize the trial court to conduct the proceeding in an arbitrary way. As stated by the Supreme Court in *Sherman v. People, supra* (p. 559), the said provisions were enacted ''for the purpose of preventing the delays which very formal proceedings require.'' The procedure adopted by the trial court in the instant case neither accorded with the statutory law, as interpreted by the Supreme Court, nor with certain fundamental principles of justice that govern every proceeding where the liberty of the citizen is at stake. Respondents were charged with conspiring to debauch the ballot box—an offense akin to treason, for it strikes at the very life of the Republic—and to affirm the findings of guilty it must appear that none of their fundamental rights were taken away or abridged. In respondents' written motion to quash or strike the petition the trial court was informed that respondents claimed that the integrity of the ballots as evidence had not been preserved and that the ballots had been tampered with while they were in the custody of the Board of Election Commissioners. In spite of that knowledge the trial court at the outset of the proceedings assumed that the ballots presented in the trial court were in the same condition as they were when respondents turned them over to the Board of Election Commissioners; as-

sumed, further, that respondents were guilty, and called upon them to make a "good explanation," at the same time warning them that if they failed in that regard he would find them guilty. The trial court evidently did not believe the respondents could make a good defense to the charges.

After the instant appeal had been perfected the petitioner filed a motion in this cause that we enter an order dismissing the appeal upon the ground that there is no provision in the Election Act "for an appeal or for any review of a summary proceeding for contempt." The motion was, of course, denied. (See *Sherman v. People, supra,* p. 560.) The contention that the judgment of the trial court in the instant proceeding is final accentuates the attitude of the trial court toward the respondents as expressed in his statement at the outset of the hearing. It would ill accord with the principles of American jurisprudence if a *nisi prius* judge had the power to sentence an election official to two years in jail for contempt and the official have no right to have the judgment reviewed.

In *Sargent v. Newell,* 368 Ill. 479, an election contest case, the court said (p. 481) : "The rule is well established that in order for the recount of the ballots to overcome the returns of the election officials the contestant must prove that the ballots are those voted at the election and that they are in the same condition as they were when cast. *The integrity of the ballots must be securely protected.* In an election contest, it must be proved that they were so preserved that there was no reasonable opportunity for tampering with them. Actual tampering with the ballots need not be shown to destroy their evidentiary value, but it is enough that the opportunity for unlawful interference was afforded. (*Bolton v. Whalen,* 350 Ill. 50, and cases therein cited.) Applying the rule to this case, we are of the opinion that the evidentiary value of the ballots was destroyed. In *Sibley v. Staiger,* 347 Ill. 288, and

*Bullman v. Cooper,* 362 id. 469, we held the mere fact that the ballots were kept in an unlocked receptacle for several days, when the seals remained intact, did not impair the evidentiary value of the ballots. Here, however, the uncontradicted evidence is that the seal at the time of this trial was not the seal that was put on the bag on the night of the election. If, then, the seal was removed, there can be no doubt that there was ample opportunity to tamper with the ballots. Under these circumstances the circuit court correctly held the ballots had not been properly preserved, and that the election returns were controlling.'' (Italics ours.)

In *Rogers v. Meade,* 363 Ill. 630, also an election contest case, the court said (pp. 637, 638): ''To obtain a reversal of the judgment the appellants contend that the integrity of the ballots in the twenty-ninth precinct was preserved, that there was a substantial compliance with the method of preservation prescribed by the Ballot law, and that they should therefore have been admitted as superior evidence of the result of the election in that particular precinct. The law applicable to the factual situation presented is well settled. The returns of the judges and clerks are *prima facie* evidence of the result of the election, but the ballots are the original evidence of the votes cast and in case of a contest are better evidence of the result if they have been preserved in the manner prescribed by the statute. (*Talbott v. Thompson,* 350 Ill. 86; *Graham v. Peters,* 248 id. 50.) Conversely, if the evidence discloses that the ballots were exposed to the reach of unauthorized persons, and the returns are not discredited, the ballots will not be regarded as better evidence of the result of the election. (*Talbott v. Thompson, supra; Bolton v. Whalen,* 350 Ill. 50.) The question of whether the ballots have been properly preserved is in each action necessarily one of fact, to be determined by the evidence. (*Bullman v. Cooper,*

362 Ill. 469; *Sibley v. Staiger,* 347 id. 288.) *The contestant is the moving party, and the burden rests upon him to prove that the ballots have been kept intact. It is not incumbent on the defendant to show that they have been changed, and unless the contestant shows that they have been kept in such a way that there was no reasonable opportunity for tampering with them they cannot overcome the returns.* (*Talbott v. Thompson, supra; Bolton v. Whalen, supra; Alexander v. Shaw,* 344 Ill. 389; *Graham v. Peters, supra.*) Nor is it necessary that actual tampering with the ballots be shown, but it is enough to invalidate them as evidence that the opportunity for unlawful interference of unauthorized persons existed. (*Talbott v. Thompson, supra; Alexander v. Shaw, supra; Rottner v. Buchner,* 260 Ill. 475.) Application of the above cardinal principles to the facts in the present case necessarily leads to the conclusion that the ballots of the twenty-ninth precinct lacked probative force. It suffices to observe that during the twenty days the ballots were kept in the vault of the town clerk numerous persons, irrespective of whether engaged upon official business, gained ready admittance to the vault. Reasonable, if not abundant, opportunity for tampering with the ballots existed, and the evidence tends to show actual interference with them. In particular, the condition of the seal on the ballot sack was not the same as when the sack was sealed on the evening of election day. The appellants have failed to sustain their burden of establishing that the ballots were in the same condition when offered in evidence as when they were cast." (Italics ours.)

See, also, *Anderson v. Wierschem,* 373 Ill. 239. In that case the court stated (pp. 243, 244): "The ultimate question for our decision is whether or not the probative value of the ballots certified to us for inspection is sufficient to overcome the poll-books and

tally-sheets which are in writing and three copies of each of which are signed by six persons—*i.e.* three judges and three clerks of election, and which are, in all respects, regular and in due form. It is apparent from the record that nine persons participated in and observed the actual counting of the ballots and that all nine of them agreed, and six of them certified over their signatures, that there were only two spoiled ballots. Thereafter, two men were left alone with these ballots and they were the only two who testified that the bag was even sewed. Admittedly it was not sealed, and these same two men said there was no wax among the election supplies, although one of the clerks testified to the contrary. Whether the bag was sewed or not, it is apparent to us, on actual inspection, that, in the absence of wax, it would have been a comparatively simple matter to open the bag and resew it. It is unimportant, however, to determine whether or not it was sewed and then opened and resewed, because it is obvious, on the face of the testimony of all witnesses, that these two judges had an ample opportunity to tamper with the ballots if they were so inclined. They not only had the opportunity, but plenty of time for the accomplishment of this purpose, and it is significant that there is at least some discrepancy in the evidence as to the length of time they stayed alone with the ballots. At any rate, when the bag was opened twenty-four ballots were found double marked for supervisor, in addition to the two which had been found so marked when the nine persons had examined them at the close of the polls. The probability of so many persons overlooking so many double-marked ballots when they were being counted at the close of the polls is so remote, and the opportunity for tampering with the ballots themselves is so apparent, that we do not believe the probative value of those ballots is such as to overcome the official and

duly certified returns of the election officials. The county court erred in giving them this effect and its judgment must be reversed.'' In that case it was stipulated that the ballots were properly preserved from the time they reached the hands of the town clerk until the bag was opened in the County court. In *Alexander v. Shaw*, 344 Ill. 389, the Supreme Court adhered to the rule that the burden is on the contestant to prove that the ballots have been properly preserved.

While the cases we have cited involved election contest proceedings, no good reason can be advanced why less stringent rules in respect to the proof as to the preservation of the integrity of the ballots should be followed in a case like the instant one, where the good name and liberty of election officials are at stake. In this connection it must be remembered that the instant petitioner represents the Board of Election Commissioners of the City of Chicago, which under the law has the care and custody of the ballot boxes and is in a position to readily prove that it has performed its duty of safeguarding and protecting the ballots contained therein, and it would be an unconscionable rule of law that would cast upon respondents the burden of proving that the Board did not preserve the integrity of the ballots. If the rule stated in the election contest cases is not applicable in a proceeding like the case at bar it would be dangerous for a citizen, however upright he might be, to assume the position of an election official.

The material question for us to decide is whether the petitioner has successfully borne the burden of showing that the ballots had been kept in such a way that there was no reasonable opportunity for tampering with them; or, to put it in another way, whether the petitioner has proved that the ballots were preserved in such a manner as to establish their integrity as evidence. This brings us to a consideration of the evi-

dence bearing upon this question: The respondents, after the close of the election at 5 o'clock p.m., examined, sorted, counted, tallied, wired, and sealed the ballots in the ballot boxes. Then the judges and clerks, riding in an automobile, brought the ballot boxes directly to the City Hall from the place of the election, located at Princeton avenue and 31st street. The pay vouchers of the respondents were stamped by the Election Commissioners with an electric clock stamp at 6:57 p.m., April 4, 1939. When the judges and clerks arrived at the LaSalle street entrance of the City Hall the ballot boxes were there taken by an employee of the Election Commissioners' office (not identified), who, together with fourteen other people from that office, were taking ballot boxes as they were delivered by precinct officials. The boxes were removed from the sidewalk by the said employees and placed in vans, to be taken to Werner Brothers Warehouse, where all ballot boxes were kept by the Election Commissioners, who had supervision and control of certain rooms in the Warehouse. No receipt was given to respondents when they delivered the ballot boxes and no record was made on the night of April 4, 1939, by the Board of Election Commissioners of the receipt of the ballot boxes of the precinct in question. No record was made of the time when they were removed from the sidewalk, nor of the particular van in which they were placed. When a truck delivered ballot boxes at the Warehouse for storage no record was kept by the Warehouse as to the ballot boxes thus delivered. The Warehouse kept no "inventory of any kind." Stanley Wronski, an employee of the Board, testified that "on April 5th and 6th I saw all the ballot boxes" in the Warehouse, and that on April 7 he placed "all of the ballot boxes from the 11th ward" in the vault; that on April 5th and 6th he checked up the ballot boxes of the 11th ward and found two—not the ones in question —missing.

On November 10, 1939, about seven months after the election in question, the judge of the County court of Cook county entered an order appointing James F. Connery, an employee of the Board of Election Commissioners, a special commissioner of the County court of Cook county, to supervise a recounting of the ballots cast in the precincts and wards of the City of Chicago in the General election of November, 1938, the Primary election of February, 1939, the City election of April, 1939, and the Judicial election of June, 1939. The order provided ''that all of the ballot boxes . . . [of the said elections] be produced at the Board of Election Commissioners' rooms from the warehouse and vaults where said ballots are now stored and that said ballot boxes shall be opened and the ballots counted and recorded and that the same be done immediately upon the entry of this Order.'' The order further provided that Connery was to report to the County court of Cook county a full and complete report of the recounting. The order gave no directions as to the method to be pursued in making the recounts. Connery used teams in making the recount. Each team was composed of two men, employees of the Board; one designated as the caller, who received the box from the vault, opened it and examined the contents and recounted the ballots; the other, a tallier, who tallied the results as announced by the caller. Connery selected James Kucharczyk and Edwin Czosek to make the recount of the ballots of the precinct in question. On November 9, 1939, Wronski removed the ballot boxes in question, together with other boxes, from Werner Brothers Warehouse, ''brought them to the Board of Election Commissioners and placed them in Vault 2.'' He testified that the said ballot boxes were then under his supervision and care; that on November 11, 1939, he removed the said boxes from Vault 2 ''for the purpose of recount'' and placed them on a table about 20 or 25 feet from the vault; that at the time the following

persons were receiving ballot boxes for the recount: James Kucharczyk, James Farley, C. B. Hopkins, Rzewski, L. Garrippo, P. Casella, L. Joyce, and George Leininger; that Kucharczyk received the box that belonged to the precinct in question. Wronski also testified that he did not remain and watch Kucharczyk count the ballots of the instant precinct; that when he turned the box over to Kucharczyk it was then in the custody of the latter; that he did not assign anybody to watch the ballot box while Kucharczyk made the recount. Kucharczyk testified that this box was tied four ways with rope and the knot of the rope was sealed with sealing wax; that he broke the seals, cut the rope and threw it in the scrap pile; that he destroyed the ropes; that he examined the contents of the box, removed the ballots from the wire to which they were strung, and after unfolding the ballots he numbered each one in the upper right-hand corner with a numbering machine; that he examined and counted the ballots, and that as he called the ballots Czosek tallied them.

After they had finished the recount Kucharczyk and Czosek made the following written ''Statement of Recount and Findings,'' which was introduced as an exhibit by petitioner:

''BOARD OF ELECTION COMMISSIONERS
Edmund K. Jarecki, County Judge
STATEMENT OF RECOUNT AND FINDINGS

WARD 11
PCT. 53
Date Nov. 11, 1939

The following statement is the result of a recount of Ballots Voted (Gray Box), at an Election in the City of Chicago, County of Cook and State of Illinois, on the 4th day of April, A. D. 1939, for the persons herein named; and Ballots not voted (White Box), in the 53 precinct of the 11 ward; pursuant to an

order by the County Court of Cook County, November 8th, 1939.   Said recount was conducted in the office of the Board of Election Commissioners, Room 308— City Hall, Chicago, Illinois, on the above date.

| Candidate For | Official Count | Re-count | Void Ballots | Ballots not Initialed | Gain | Loss |
|---|---|---|---|---|---|---|
| Office of Mayor | | | | | | |
| Edward J. Kelly........521 | 509 | 9 | | | | 12 |
| Dwight H. Green ....... 30 | 31 | 2 | | | 1 | |
| Arthur P. Reilly ........ 2 | 2 | | | | | |
| Office of City Clerk | | | | | | |
| Ludwig D. Schreiber ....523 | 509 | 10 | | | | 14 |
| John Wm. Chapman .... 28 | 27 | 1 | | | | 1 |
| Stanley R. Pulaski ...... 2 | 2 | | | | | |
| Office of City Treasurer | | | | | | |
| Thomas S. Gordon ......522 | 508 | 10 | | | | 14 |
| Clement A. Nance ....... 29 | 28 | 1 | | | | 1 |
| Oscar B. Tallacksen ..... 2 | 2 | | | | | |

Office of Alderman

| RECOUNT OF WHITE BOX | RECOUNT OF GRAY BOX |
|---|---|
| Mayoralty Ballots Spoiled......3 | Mayoralty Ballots Voted.....553 |
| Mayoralty Ballots Not Voted | Mayoralty Ballots D & O.... 0 |
| ....................144 N.I. | Aldermanic Ballots Voted...... |
| Aldermanic Ballots Spoiled...... | Aldermanic Ballots D & O...... |
| Aldermanic Ballots Not Voted.... | Further contents D & O |
| Further Contents ..........None | Envelope Empty |

Remarks:
Total Official Mayoralty Ballots (Gray and White Box)..........700
Total Official Aldermanic Ballots (Gray and White Box) ............
Number of Official Mayoralty Ballots sent to precinct ..............
Number of Official Aldermanic Ballots sent to precinct ..............
Number of Applications for Ballots ...............................
   We, the undersigned, duly authorized and appointed Caller and Tallier, CERTIFY that the above recount made by us, showing the total number of votes given for each of the above persons, and recount of the ballots not voted, is true and correct in every respect.
J. KUCHARCZYK   Caller                    Edwin Czosek   Tallier''

It appears from Kucharczyk's testimony that he was unable to tell in what respect the ballots shown in the "Void Ballots" column in the above statement were void. Czosek testified that no one watched him while he tallied the count but that after he got through tallying he handed the count back to Kucharczyk. Kucharczyk also made a written report in which he states that the boxes in question were brought to him by Stanley Wronski at 9:25 a.m. and that he returned them to Wronski at the vault at 12:30 p.m.; that when he received the box "one flap pasted to bottom of box the other flap loose"; that the rope was "tied 4 ways knot sealed with wax"; that when he returned the box it was "tied with rope, knot sealed, and box sealed with paper seals and signatures affixed to seals by J. Kucharczyk." Connery testified that he supervised the recount in question; that on the morning of November 11, 1939, 18 or 20 boxes were opened and that approximately 9 men were opening ballot boxes; and that no person altered or changed any of the ballots *while he was present*. It clearly appears from his testimony, however, that he did not handle the ballots; that he did not even examine the ballots that Kucharczyk called as void ballots; that he did not know whether the ballots that Kucharczyk called as void were void or not; that he kept no record of the ballots that were declared void by Kucharczyk. Connery further testified that the first time he saw the ballot box in question was on November 11, 1939. We find no statement in the report of Kucharczyk and Czosek that even suggests that Kucharczyk found any evidence of fraud upon the ballots when he examined and recounted same on November 11, 1939.

On November 17, 1939, the "53d precinct gray box," that contained the ballots that were cast at the election, was removed from Vault 2 by Wronski and turned over to Czosek, who turned it over to Katherine Keeler, an examiner of questioned documents. We find nothing in the record to show why Wronski turned the

ballot box over to Miss Keeler. He testified that Miss Keeler examined the ballots but that he did not know whether she counted them or whether she had all of the ballots out of the box; that he was not close enough to tell what was going on. Miss Keeler returned the box to Czosek, who returned it to Vault 2. While Miss Keeler testified that she examined the ballots on November 17, there is nothing in the record to show what report, if any, she made as to the result of her inspection of the ballots on that date. After she made another examination of the ballots in question on January 3, 1940, during the instant trial, she testified that she found erasures and alterations on 37 ballots, indentations on others, and embossments and pickups of lead on certain ballots.

Respondents' counsel makes so many points in support of their contention that the evidence shows that the integrity of the ballots as evidence had been destroyed and that the court erred in admitting them in evidence, that we feel compelled to refer only to the more important ones. It is strenuously urged by respondents that the court had no power or authority to appoint a special commissioner to recount the ballots out of the presence of the court; that there is in the Election Act no provision that gives to the County court such authority; that the opening of the ballot boxes and recounting of the ballots by Connery was a violation of the law and destroyed the integrity of the ballots as evidence. In answer to this contention petitioner states that the opinion in *Stockholm v. Daly,* 374 Ill. 441, supports its position that the County court had authority to appoint the special commissioner to recount the ballots out of the presence of the court. The *Stockholm* case does not support petitioner's position. There the petitioner filed in the Supreme Court an original petition for a writ of mandamus to compel the members of the Board of Election Commissioners of the City of Chicago and the judge of the County court of Cook county to destroy the ballots used at

certain elections held in Chicago, for the. reason that more than six months had elapsed since the date of the last of said elections; that no election contests were pending; that none of the ballots had been impounded by order of court and no *subpoena duces tecum* or other lawful process had been issued to compel the production of any of said ballots before any court of competent jurisdiction or any grand jury. In the answer of the County Judge he averred that there were a large number of cases either pending or undisposed of involving malfeasance by judges and clerks of election and others authorized to take part in elections, or involving persons who wilfully made false canvasses or official statements of votes cast, knowing them to be false; that the ballots used in the said elections had not been destroyed for the following reasons (pp. 443, 444): "(1) Pendency of the designated cases; (2) defendant Judge Jarecki has directed that the ballots be not destroyed because of the pendency of the named cases, and (3) that the judge of the county court has not designated two electors, as provided for by the statute, for the reason that said cases are pending and undisposed of, and further, for the reason that as county judge he firmly believed and still believes that the use of such ballots is and will be necessary in pending and undisposed of cases, and that as it had been shown to him in open court that fraud, criminal neglect and misconduct have been perpetrated by judges and clerks of election, by other election officials and others, in the casting, counting, tabulating, recording and reporting of votes and results at such elections, as well as in the manipulation of such returns for the purpose of falsifying and improperly reporting the same, and that many persons are guilty of criminally interfering with the proper conduct of such elections, and, further, that he believes it his duty as judge of the county court to order said board of election commissioners not to destroy said ballots. The defendant county judge admits that he

directed said board to preserve and retain the ballots as evidence for the purpose of prosecution and punishment of said offenders against the law applicable to such offenses, and alleges that all of his acts were done in the exercise of his judicial discretion. The answer further avers that the ballots were presented to the grand jury as evidence and are, in part, the basis for indictments voted by said body, and now necessary to be preserved and used as evidence in the prosecution of said indictments." Plaintiff demurred to this answer, thus attacking its sufficiency as a matter of law. The Supreme Court states (p. 445): "The gist of plaintiff's contention is that the statutes requiring the destruction of ballots, except where a contest is filed and undisposed of, are mandatory, and that, therefore, in law, the ballots have no existence in such case for any purpose whatever after the period of six months following the election have elapsed." But the Supreme Court held that the facts set up in the answer were admitted by the demurrer and they presented a situation justifying the refusal of the writ. The authority of the County court to appoint Connery a special commissioner was not passed upon by the Supreme Court.

We know of no section of the Election Act (ch. 46, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 43.001 *et seq.*]) that authorizes the County court to appoint a Special Commissioner to recount ballots out of the presence of the court. The Board of Election Commissioners of the City of Chicago has the care and custody of all ballot boxes but it cannot open a box and count the ballots therein save as expressly provided by the statute. It was admitted of record that there were no charges pending against the Election Commissioners and that the three Election Commissioners then serving had been legally appointed and were performing their duties. While we do not deem it necessary to pass upon the legality of Connery's appointment, we have the right to consider his acts

and the acts of his assistants in the matter of the recount in determining the question as to whether or not the integrity of the ballots as evidence was preserved. We feel impelled to say, however, that it appears to us that the appointment of Connery to recount the ballots cast in four elections in Chicago, *out of the presence of the court,* constituted an unsafe procedure; one that was likely to destroy the integrity of the ballots as evidence. As far as we are aware, in election contempt cases that arose before the appointment of Connery the ballot boxes were opened for the first time and the recount made in the presence of the County judge. That procedure is undoubtedly safer than the one adopted in the instant case.

From the opinion in *Stockholm v. Daly, supra,* it appears that the County judge ordered the recount by Connery because he believed that a recount would show fraud, criminal neglect and misconduct by judges and clerks of election in the casting, counting, tabulating, recording and reporting of votes and results at the four elections, as well as in the manipulation of such returns for the purpose of falsifying and improperly reporting the same. Connery, of course, understood the purpose of the recount, and it must be assumed that Kucharczyk and Czosek also understood it. Having in view the purpose of the recount we will consider the written report made by Kucharczyk and Czosek. That report shows that Edward J. Kelly received in the official count made by the precinct election officials 521 votes for Mayor, and that upon the recount by Kucharczyk he received 509 votes; that Kucharczyk deducted 9 votes from Kelly as void ballots, and also deducted 3 "spoiled ballots." Upon his examination as a witness in the instant proceedings Kucharczyk testified that he was unable to tell in what respect the 9 ballots shown in the "Void Ballots" column in his report were void. Neither in his report nor in his testimony is there any state-

ment that erasures and alterations appeared upon the face of ballots. Nor is there any statement that certain ballots evidenced fraud. Petitioner's counsel concedes that the report made by Kucharczyk and Czosek "would never have made the basis of a contempt proceeding" against respondents. When the ballots were exhibited in court during the present proceedings, what appeared? To quote from petitioner's brief:

"The ballots in evidence disclose that there are erased cross marks on the following numbered ballots, 71, 81, 82, 83, 85, 86, 88, 89, 91, 92, 93, 94, 95, 96, 181, 182, 183, 184, 187, 186, 188, 189, 190, 231, 232, 233, 234, 235, 236, 238, 239, 240 (Abst. 46) and each bear a cross mark in the Democratic circle (Abst. 46). . . . On each of the following numbered ballots, 71, 82, 89, 181, 235, the cross in the Democratic circle was different from the residue of the erased cross in the Republican circle (Abst. 48); on ballots 82 and 92 the cross mark on each was made by the same person (Abst. 48); the cross mark in the Democratic circle on ballot 181 made an indentation on ballot 236, the cross mark on ballot 184 made an indentation on 185, the cross mark on 188 made an indentation on ballot 187, the cross mark on 187 made an indentation on ballot 186 and also on ballot 182 (Abst. 47); the cross mark on ballot 473 made an indentation on ballot 157 (Abst. 48); all of the following numbered ballots have pickups of lead in the shape of a cross mark on the back of each, 94, 183, 184, 185, 187, 188, 189, 190, 232, 235, 236, 238 and 240 (Abst. 47); the following numbered ballots, 147, 202, 242, 290, 346, 451, 524, all have embossments on their backs (Abst. 50); ballots 40, 239, 233, 232, 190, 231, 236, 186, bear cross marks all made by the same person (Abst. 50); ballots 219, 343, 11, 270 (Abst. 47) and ballot 100 (Abst. 52) have erasures on each."

Respondents admitted upon the trial and admit here that 37 of the ballots that were presented in court

showed erasures and alterations. We have the ballots before us, and the erasures and alterations upon 37 ballots are so obvious that they may be readily seen with the naked eye. The person or persons who made the erasures and alterations made no attempt to conceal the changes that were made upon the ballots. The condition of these 37 ballots cannot be reconciled with the report made by Kucharczyk and Czosek. Although the respondents strenuously contend that the ballots of this precinct were not properly protected from the time they were delivered to the Board of Election Commissioners on the night of the election until the ballot boxes were opened by Kucharczyk, we may assume, for the purposes of this appeal, that the ballots returned by the respondents to the Board were safeguarded and their integrity as evidence preserved until they were turned over to Kucharczyk for his recount, on November 11, 1939. He was delegated by Connery to make the recount as a representative of the County court and for that purpose he was given custody of the ballots. He knew the purpose of the recount and also knew that it was one of his particular duties to ascertain from the ballots themselves if they had been tampered with. It is fair to assume that if, at the time he made his recount, 37 ballots showed erasures and alterations that were plainly visible to the naked eye, he would have noted that fact as he called off the ballots to the tallier, Czosek, and he would have indicated it in his written report to the County court. Kucharczyk placed the figure ''9'' in the ''Void Ballots'' column in his report, without indicating, in the report, why he classified 9 ballots which were marked for Edward J. Kelly as being void. In his testimony upon the trial he was unable to state why he classified them as void. Neither in his written report nor in his testimony is there any intimation that there was an erasure or an alteration on a single ballot taken from the gray box and re-

counted by him on November 11, 1939. Indeed, counsel for petitioner, as heretofore stated, concedes that the written report made by Kucharczyk and Czosek *"would never have made the basis of a contempt proceeding"* against respondents. As Kucharczyk's recount was expressly authorized and directed by the County court the result of that recount should control, in the instant proceedings, as to the condition of the ballots on November 11, 1939, in the absence of any showing of fraud or mistake in the report, and counsel for petitioner makes no charge of any kind in reference to that report. At the conclusion of the recount by Kucharczyk the ballot boxes containing the ballots for the precinct in question were returned to the care and custody of the Board of Election Commissioners, where they remained until November 17, 1939, when, according to the testimony of Wronski, the gray ballot box was turned over to Katherine Keeler, the expert. The record does not disclose whether or not she made any report as to what she found concerning the ballots on that occasion. Upon the trial she testified that when she examined the ballots on November 17 she found erasures on 37 of them, and embossments and indentations on some of them. When she finished her examination of the ballots on November 17, 1939, they were returned in the gray box to Vault 2 in the office of the Board and they continued in the possession and custody of the Board until they were produced in evidence upon the trial. That something happened to the ballots between November 11, 1939, when Kucharczyk recounted them and made his written report, and December 19, 1939, when they were produced in court, recounted and examined before the County judge and presented in evidence against respondents, is evident, and we are forced to the conclusion that between the time of the recount by Kucharczyk and the time that the ballots were presented in court someone tampered with certain of them; and after a careful

consideration of all of the facts and circumstances bearing upon the instant question, we are satisfied that under the law and the evidence petitioner failed to prove that the integrity of the ballots as evidence had not been destroyed. If we are right in this conclusion then the court erred in admitting the ballots in evidence. As we have heretofore stated, counsel for petitioner concedes that ''the ballots are the only evidence of the respondents' corruptness.'' Upon the oral argument in this court counsel for the Board of Election Commissioners stated that the evidence against respondents would not have warranted their indictment by a grand jury, but he contended that the evidence was sufficient, in a summary proceeding like the instant one, to sustain the judgment. We cannot agree with this contention.

Petitioner urges that the ballot box be protected, and concludes his brief with the following appeal: ''. . . the sentences imposed in this case may contribute to help check the growing disregard for the citizen's right to express his voice in his government.'' In this opinion, as well as in several other opinions in cases decided by this court, we have expressed the view that a conspiracy by election officials to debauch the ballot box is in its nature akin to treason, for it strikes at the very life of the Republic, and we have always affirmed judgments against election officials where the evidence warranted the judgments. But where, as here, the evidence does not warrant a finding of guilty we will not hesitate to reverse such finding. The protection of the ballot box does not require that election officials who have not been proved guilty of misconduct be punished.

That part of the judgment order of the County court of Cook county of April 5, 1940, which finds and adjudges respondents Albert Ferro, Mary Nadine Segvich and Frank Guinta guilty of contempt of the County court of Cook county, and sentences Albert

Ferro to the County jail for the period of two years, sentences Frank Guinta to the County jail for the period of two years, and sentences Mary Nadine Segvich to pay to the Clerk of the County court the sum of $1,500 as a fine, is reversed.

*That part of judgment order of April 5, 1940, that applies to respondents Ferro, Segvich and Guinta, reversed.*

SULLIVAN and FRIEND, JJ., concur.

ADDITIONAL OPINION UPON PETITION FOR REHEARING

The petitioner has filed a petition for rehearing in this cause. In support of the same petitioner has filed a written motion asking permission to file a certain document in the cause and "moves the court that said document be made part of the record of the above entitled cause and be considered by the court in examining the petition for rehearing." Attached to the motion is a photostatic copy of what appears to be a part of a sheet of paper bearing no date and upon which appear short notations made by a number of persons. The so-called document was not introduced in evidence in the trial court, but the petitioner contends that this court has authority under section 92 of the Civil Practice Act [Jones Ill. Stats. Ann. 104.092] to receive additional evidence and to consider the same in passing upon the appeal. We have no such authority. In *Schmidt v. Life Assurance Society*, 376 Ill. 183, 197, 198, appears the following:

"Per Curiam: A motion has been made in this case under section 92 of the Civil Practice act (Ill. Rev. Stat. 1939, chap. 110, par. 216) to submit to this court certain original evidence not offered in the trial court.

"This section purports to give the Supreme and Appellate Courts power to receive evidence not produced on the trial. Except as provided by the constitution for the filing of original suits in the Supreme Court, its jurisdiction is wholly appellate. In so far as

section 92 of the Civil Practice act, *supra,* attempts to give the Supreme Court original jurisdiction on the appeal of a cause, of matters germane upon the trial thereof, this provision contravenes section 2 of article 6 of the constitution, which provides that the Supreme Court has appellate jurisdiction, only, in all cases except in cases relating to the revenue, *mandamus* and *habeas corpus.* The matters offered do not come within the original jurisdiction of the court. The motion is denied.''

We have heretofore entered an order denying the motion of the petitioner. Even if we had the power to receive original evidence it is plain that it would be a grave injustice to the respondents to admit the so-called document in evidence and to consider the same in passing upon the merits of this appeal.

We find no merit in the petition for a rehearing and the said petition is therefore denied.

*Petition for rehearing denied.*

SULLIVAN and FRIEND, JJ., concur.