People of State of Illinois ex rel. Henry E. Marski, Appellee, v. Thelma King, Rose Peoples, Aletha Cherry, Wealthie Cochran and Mattie Houston, Appellants.

Gen. No. 44,013.

626

Opinion filed November 16, 1948. Released for publication December 2, 1948.

ELLIODOR M. LIBONATI, of Chicago, for appellants; WILLIAM VIHON, of Chicago, of counsel.

WILLIAM P. TUOHY, State's Attorney of Cook County, for appellee; JOHN F. CASHEN, JR., Special Attorney to Board of Election Commissioners, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

An order was entered in the County court of Cook county granting Henry E. Marski, Assistant Chief Clerk of the Board of Election Commissioners of the City of Chicago, leave to file the following verified petition:

" . . .

"2. That on the 3rd day of June, 1946, an election was held in the City of Chicago, County of Cook and State as aforesaid, for the election of judges of the Circuit and Superior Courts of Cook County, and also for certain propositions that were submitted to the electorate at said election.

"3. That at and during said election the following named persons hereinafter called the respondents,

served in the election precinct known as the 37th precinct of the 28th ward of said City of ¡Chicago, as judges and clerks of election, as indicated opposite their names, respectively, towit:

"Thelma King Republican Judge
 Rose Peoples Republican Judge
 Aletha Cherry Democratic Judge
 Wealthie Cochran Republican Clerk
 Mattie Houston · Democratic Clerk

"4. That at and during said election each of the said respondents who served at said election misconducted and misbehaved himself as such judge or clerk of election, as more fully hereinafter appears, and that, as to each of said respondents, his misconduct and misbehavior constituted, as your petitioner is advised, informed and believes, a contempt or contempts of this Honorable Court, said respondents being officers of the County Court.

"5. That petitioner is informed and believes that said respondents permitted applications to be presented and filed and ballots to be cast in the names of persons who did not personally appear at the polling place and vote in said June 3rd, 1946, election; permitted applications containing the forged signatures of voters to be presented and filed and ballots cast in the names of the same; made a false canvass and return of the votes cast.

"Wherefore your petitioner respectfully prays that an order and rule may be entered by this Honorable Court against each of aforesaid respondents, demanding him to be and appear in this court at a time to be designated in said order, then and there to show cause, if any he can, why he, as an officer of said court, should not be adjudged guilty of a contempt or contempts of this court for misconduct and misbehavior in office, and on account of the matters and things hereinbefore alleged."

Respondents were ruled to show cause why they should not be adjudged guilty of contempt and punished for contempt, and writs of attachment were ordered issued against them. After a hearing upon the petition and answers a judgment order was entered that contained, *inter alia,* the following:

"That THELMA KING served as Republican Judge, ROSE PEOPLES served as Republican Judge, ALETHA CHERRY served as Democratic Judge, WEALTHIE COCHRAN served as Republican Clerk and MATTIE HOUSTON served as Democratic Clerk at the elections held June 3, 1946, and as such were officers of the County Court of Cook County;

"THE COURT FURTHER FINDS, that the respondents, Thelma King, Rose Peoples, Aletha Cherry, Wealthie Cochran and Mattie Houston, *were guilty of misconduct, misbehavior in office as officers of the County Court in the conduct of the elections held June 3, 1946,* in the 37th Precinct of the 28th Ward . . .; and . . . *further finds, that the said respondents because of such misconduct and misbehavior in office as election officials* of said precinct and ward, are guilty of contempt of the County Court of Cook County;

"IT IS ORDERED, that Thelma King, Rose Peoples, Aletha Cherry, Wealthie Cochran and Mattie Houston, each be committed to the Cook County jail for a period of sixty (60) days.

". . ."

Respondents appeal.

Respondents strenuously contend that "the evidence fails to prove respondents wilfully performed any wrongful act or permitted any other person to perform a wrongful act," and they insist that they were found guilty because "unwarranted emphasis was placed on the testimony of the handwriting expert" by the trial court.

To support the charges in the petition, petitioner first called as witnesses 25 persons who were

registered voters in the precinct. Each of these witnesses testified that they voted at the election, and when shown the application card for a ballot that bore the name of the witness each testified that they signed the application. Petitioner's counsel states that the 25 witnesses gave testimony contrary to what the prosecution expected, but he insists that because petitioner called the witnesses "does not mean that these witnesses were truthful." After the 25 witnesses had testified petitioner called its regular handwriting expert, Rudolph B. Salmon, who testified, *inter alia,* that in spite of the fact that Constance Clements, Margaret Smith, Lawrence Jack, Joseph Mikulski, Louise Klapp, Betty Cook and Edward Kay each testified that they signed the application card that bears their name, he was of the opinion that the said cards were not signed by the said parties and were forgeries. We must assume from his testimony that the expert found that 18 of the 25 witnesses testified to the truth. We have made a careful examination of the 7 application cards that the expert states are forgeries and compared the signatures thereon with the corresponding signatures upon the registration cards, and we are of the opinion that we would not be justified in finding that the election officials did not act honestly and to the best of their ability in passing upon the genuineness of the signatures upon the said cards. As to the signatures of Louise Klapp and Betty Cook upon the application cards we are of the opinion that if an election official who in his daily work was required to read the handwriting of others made a careful comparison of the said signatures he would probably suspect that the signatures upon the said two application cards were forgeries. We did not reach this opinion, however, until after we had made a careful study of the said signatures.

The petition charged that the election officials "*permitted* applications to be presented and filed and

ballots to be cast in the names of persons who did not personally appear at the polling place and vote in said June 3rd, 1946, election; *permitted* applications containing the forged signatures of voters to be presented and filed and ballots cast in the names of the same . . . ." Petitioner contends that the petition is so drafted that it was not necessary for the prosecution to prove that the acts of respondents were knowingly and intentionally committed, and that, therefore, *People v. Fusco,* 397 Ill. 468, cited by respondents, does not apply to the instant petition. This contention is clearly an afterthought. The case was tried upon the theory that respondents had knowledge of the wrongful acts charged, and in its brief petitioner argues that "respondents had knowledge of the wrongful acts complained of." However, intentional acts of misconduct are charged in the petition. The use of the word "permitted" in the petition amounts to a charge that respondents allowed the acts, tolerated the acts, consented to the acts.

Respondents earnestly argue that the trial court in making his findings gave unwarranted emphasis to the testimony of the handwriting expert, and they cite *Fekete v. Fekete,* 323 Ill. 468, which states (p. 482): "Opinions as to the genuineness of handwriting are at best weak and unsatisfactory evidence. There is much room for error and great temptation to form opinions favorable to the party calling the witness." They also cite *Lyon v. Oliver,* 316 Ill. 292, which states (p. 305): "The testimony of such witnesses is to be tested and weighed by the same rules as the testimony of other witnesses is tested and weighed."

One hundred and seventy-two applications were signed at the election. Petitioner states in its brief that its handwriting expert testified that in his opinion there were 37 forged applications, but in another part of the brief it states that the expert testified "that applications 17, 21, 22, 23, 24, 39, 41, 57, 58, 60, 62, 63,

64, 71, 98, 131, 143, 144, 145, 146, 147, 148, 149, 151 and 171 [*25*], were forgeries." After a careful study of the record we find that the expert testified that he *examined* the following applications: Nos. 17, 21, 22, 24, 39, 41, 52, 53, 54, 55, 56, 57, 58, 60, 61, 62, 63, 64, 71, 72, 98, 130, 131, 140, 143, 144, 145, 146, 147, 148, 149, 151, 153, 154, 159, 161 and 171 (*37*); that he made *"quite a few examinations"* of these applications; that by his orders 22 of the applications were photostatically enlarged; that he separated the 22 applications into four groups; that group 1 contained Nos. 147, James Ewing; 153, Lawrence Jack; 71 (application card and registration card not found in the record); 149, Arthur Peterson; 60, Arthur Curtis, and 130, Margaret Beakley; that group 2 contained Nos. 72, Louise Klapp; 63, Frank Champagne; 58, Ralph Moore; 154, Joseph Mikulski; 52, Sam Lane; 54, Constance Clements, and 3 (application card and registration card not found in the record); that group 3 contained Nos. 13, William Decker (application card and registration card not found in the record); 22, Thomas Beakley; 145, Jean Ross; 161, Helen Mikulski, and 143, Meyer Bernstein; that group 4 contained Nos. 56 (application card and registration card not found in the record); 148, Margaret Terand; 171, Bennie Jeurcke (registration card not found in the record), and 53, Barney Greenburg. The expert stated that in his opinion *each group was written by one person,* and it is upon that statement that we assume that the expert testified that the 22 applications were forgeries. However, during his testimony he testified that the signature upon application card No. 13, William Decker, in group 3, was the genuine signature of Decker, and, therefore, we conclude that the expert in his final opinion considered that 21 of the application cards were forgeries. None of the election officials, in their daily work, were called upon to compare handwriting. The situation under which they acted

was entirely different from that of the handwriting
expert when he made his tests of the writings. He was
called upon to examine *suspected signatures* and his
examinations must have extended over a period of
some days. He states that he "made quite a few ex-
aminations of so-called applications," and had 22 of
them photostatically enlarged. In reaching his con-
clusions he applied tests used by handwriting experts,
and he sometimes changed the opinion he first formed.
*Nowhere in his testimony did the expert state that the
signatures upon the 22 application cards were obvious
forgeries.* Each of the election officials passed upon
applications at some time during the day, and from
the numbers upon the 22 application cards in the four
groups it appears that some of the applications were
presented at the opening of the election and some at
its close. The officials had to act upon an application
as it was presented, and, of course, they had no op-
portunity to test, as did the expert, the handwriting
upon an application by comparing it with handwrit-
ings upon other applications. It would unduly extend
this already lengthy opinion to comment upon all of
the evidence that bears upon the 22 applications men-
tioned in the four groups. We think, however, that a
reference to certain parts of the expert's testimony
will prove instructive: In group 2 of the 22 applica-
tions appears the name Frank Champagne, No. 63. To
quote from the record: "Mr. Cashen [attorney for pe-
titioner examining the expert]: Q. I will ask you to
look at the signature on the binder card and also the
signature of the name Frank Champagne on applica-
tion 63, have you an opinion as to whether or not the
same person wrote the application? A. I have an
opinion. Q. What is that opinion? A. It is my
opinion that the binder card bearing the name Frank E.
Champagne was not written by the same person who
wrote the application No. 63. Q. That opinion is
based upon the same . . . A. Yes, except the writ-

ing is somewhat closer and is somewhat similar, but the distinct characters of the writer are different. In other words, there is a general similarity of style, but the individual characteristics such as F, T, R, the manner of making the K, the manner of making the C, the H, the P, the E. It is the same style of writing . . . ." Charles Barnes was one of the 25 registered voters called by petitioner to testify. The expert stated that he examined the registration card and also the application card, each of which bore Barnes' name. The following is part of his testimony: "Q. [by Mr. Libonati, attorney for respondents] I direct your attention to voter's application No. 11, which is part of Exhibit 7, Charles Barnes, did you have occasion to examine that signature? A. Yes, sir. Q. Did you incorporate that, did you give Mr. Cashen an opinion as to it yet? A. I originally looked at it and subsequently changed my opinion. Q. What was your first opinion? A. Doubtful. Q. And what did you base that upon? A. Well, the signatures are somewhat similar, but they are also different and in my opinion at first that it was written by a person who was seeking to simulate the writing, but I decided not to give that as a definite opinion, which I could not substantiate. Q. Still, Mr. Barnes testified that it was his signature, so your second guess at this was that it was his signature, is that right? A. No, I don't say it is his signature yet, but I am not expressing an opinion that it is not. Q. You are still doubtful? A. No, I have a suspicion, but I cannot substantiate my belief and I will not give an opinion unless I can substantiate." Ernest Kemple was one of the 25 registered voters called by petitioner to testify and the expert was examined as to the signature of Kemple upon the application card. To quote from the record: "Q. I direct your attention to No. 12, Ernest Kemple, the voter's application No. 12, what is your opinion as to the signature on People's Exhibit No. 7, application

No. 12, did Mr. Kemple write that signature? A. I think he did. He probably did. Q. How? A. He probably did. Q. Why do you say probably? A. Because in my opinion, it is awful close to justify the belief and opinion that he did write it and I don't know whether he did." Fred S. Ballard was also one of the registered voters called by petitioner. *Ballard worked for the United States Government as a postal clerk.* During the examination of the expert as to the signature of Ballard upon an application card and a registration card, the following occurred: "Q. Fred Ballard, No. 25, what is your opinion as to the signature of Fred S. Ballard? A. I think Fred probably wrote both, that the same person probably wrote both of them. Q. You say probably, do you know that Mr. Ballard came in here and testified to the fact that it was his signature? A. It is probably true. Q. Your opinion is that it is probably, is that right? A. I don't know. I have no opinion in the matter, because I didn't—I checked them and these signatures appear sufficiently alike to warrant my opinion that they were probably written by the same person." As we have heretofore stated, Constance Clements, No. 54; Louise Klapp, No. 72; Lawrence Jack, No. 153; Joseph Mikulski, No. 154, and Helen Mikulski, No. 161, each testified that they signed the application card that bears their name and voted at the election.

The vital question before us is, Did respondents permit applications containing the forged signatures of voters to be presented and filed and ballots cast in the names of the same? In determining that question we have carefully studied all of the evidence and have examined the signatures upon the application cards and the registration cards, and it is our considered judgment that the evidence is insufficient to prove the charge made against respondents in the petition. It is significant that the trial judge did not find in the judgment order that respondents permitted

applications containing the forged signatures of voters to be presented and filed and ballots cast in the names of the same. He found that respondents "were guilty of misconduct, misbehavior in office as officers of the County Court in the conduct of the elections held June 3, 1946 . . . ." If the trial judge believed that the evidence was sufficient to warrant a finding that respondents were guilty of the charge contained in the petition, why did he not so find? The judgment order does not find what acts of misconduct, misbehavior, respondents were guilty of. Each of the respondents emphatically denied that she. was guilty in any manner whatsoever of any of the charges against her and insisted that she performed her duties as an election official faithfully and to the best of her ability. The evidence shows that none of the respondents was ever in trouble of any kind before the instant charge was made against her. In *People ex rel. Rusch v. Ferro,* 313 Ill. App. 202, we stated (p. 228): "In this opinion, as well as in several other opinions in cases decided by this court, we have expressed the view that a conspiracy by election officials to debauch the ballot box is in its nature akin to treason, for it strikes at the very life of the Republic, and we have always affirmed judgments against election officials where the evidence warranted the judgments. But where, as here, the evidence does not warrant a finding of guilty we will not hesitate to reverse such finding. The protection of the ballot box does not require that election officials who have not been proved guilty of misconduct be punished." We adhere to that statement.

We are called upon to pass upon a serious contention raised by respondents. After they had concluded their proof the following occurred: The expert was recalled to the stand, and it appears from his testimony that the. trial court—not in an open court hearing—had caused the ballot box used in the election to be opened and had asked the expert to make an exam-

ination of the ballots contained therein. The witness stated, in response to a question, that he had made the examination that the court requested. Respondents' objection to the proposed testimony was overruled. The expert then testified that he had examined the cross marks upon the ballots and that in his opinion one person made the cross marks upon many of the ballots. This evidence is clearly incompetent. Respondents did not see the faces of the ballots until after the count commenced. In counting the ballots they had a right to reject spoiled ballots but they had no right to examine the cross marks upon all of the ballots for the purpose of determining whether the cross marks upon numerous ballots were made by one person. Indeed, to give election officials such a right would tend to destroy honest elections, and it is no wonder that counsel for petitioner has not attempted to justify the admission of the evidence. What weight the trial court gave the evidence in deciding the case the record does not show.

On August 4, 1948, it was stipulated that Mattie Houston, one of the appellants herein, died on September 24, 1947, and that the appeal be dismissed as to her and her appeal bond be released.

The judgment order of the County court of Cook county as to Thelma King, Rose Peoples, Aletha Cherry and Wealthie Cochran is reversed.

*Judgment order as to Thelma King, Rose Peoples, Aletha Cherry and Wealthie Cochran reversed.*

SULLIVAN, P. J., and FRIEND, J., concur.